**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-20-00158-CV**
_____

**IN THE INTEREST OF K.D.L AND J.B.C.**

**On Appeal from the County Court at Law**
**Polk County, Texas**
**Trial Cause No. CIV32624**

**MEMORANDUM OPINION**

Mother appeals the termination of her parental rights to Kyle and Jill.[1] In one issue, Mother argues that the termination of her parental rights is not in the children's best interest as required by the Texas Family Code. *See* Tex. Fam. Code Ann. § 161.001(b)(2). For the reasons explained below, we affirm.[2]

---

[1] We identify children and their family members in parental-rights termination cases by using either initials or an alias to protect the identity of the children. *See* Tex. R. App. P. 9.8(a), (b).

[2] Kyle and Jill do not share the same father. Father's rights to Jill were also terminated and her father does not appeal the termination.

1

## Background

Mother has given birth to four children but only two of the children are the subject of this appeal, Kyle and Jill.[3] At the time of trial, Kyle was five years old and Jill was two years old. Trial testimony established that Mother had a history of investigations by the Department of Family and Protective Services.

On December 19, 2018, the Department received a "priority one" intake regarding Kyle and Jill, which meant that the Department responded and investigated the allegations within 24 hours of the complaint. The report alleged that Mother was two months pregnant and was ingesting alcohol and methamphetamines in an attempt to kill her unborn child. It was also alleged that Kyle was seen holding a "bag of methamphetamines and a syringe needle" and that Mother had slapped Kyle, causing him to hit his head on a coffee table which resulted in a knot on his forehead.

Despite multiple attempts, the Department was unsuccessful in personally contacting Mother until January 2019. In the interim, a new abuse allegation arose against Mother alleging that she physically abused the children, specifically that she slapped Jill hard enough to cut her lip. Additional allegations included that Mother

---

[3] The record shows that before the proceedings in this case, Mother gave birth to a girl who died as an infant. Mother gave birth to a fourth child not long before trial and that child was placed in foster care with her sister Jill, but that child is not a part of these proceedings.

gave her children melatonin to make them sleep and that she left Jill in her crib for hours at a time without food. It was also alleged that Mother stated a family member sexually molested Jill.[4]

The Department confirmed that Jill had a cut on her lip, but Mother explained the cut resulted from a fall on the playground. According to a Department investigator, Mother agreed to have herself and her children drug tested no later than February 1, 2019. Mother failed to meet that drug testing deadline but ultimately completed her drug test on February 12, 2019. Mother tested positive for methamphetamines, marijuana, and amphetamines; however, Mother left the testing facility before the children could be drug tested. Eventually, Jill was given a drug test, which was positive for methamphetamines. As a result of the positive drug tests, as well as the Department's history with the Mother, the Department conducted an emergency removal of the children.

Destiny Moffett, a Department conservatorship caseworker, was assigned to Kyle and Jill's case. Moffett met with Mother, created a service plan for Mother and instructed Mother, among other things, on how to complete her service plan, what

---

[4] It was unclear in the initial intake which family member was accused of molesting Jill. Testimony at trial named Kyle, but Mother's own brief names Kyle's father as the alleged abuser. Nonetheless, testimony at trial does not support this allegation, as the record demonstrates that Kyle's Father was an appropriate caregiver, and there was no evidence that Kyle exhibited inappropriate behavior. The Department and other caregivers encouraged Kyle to have a relationship with his sister.

the expectations from the Department were for reunification, and gave Mother an opportunity to discuss any concerns or questions. Moffett stated that as the caseworker, she typically has monthly contact with the parents and is available at other times "if anything comes up[.]"

Moffett testified the Department had ongoing concerns regarding Mother's admitted continued drug use, even after her children's removal. According to Moffett, Mother was placed in a 30-day inpatient rehab, and she continued to test positive for drugs after leaving the rehab. Moffett also stated that Mother failed to complete her service plan, including being successfully discharged from an outpatient alcohol and drug treatment program and in failing to maintain an appropriate home for her children.

In October 2019, Moffett visited Mother's home and described it as "not appropriate." Moffett noted that the home had old appliances and random objects on the porch, was cluttered with clothes, there were holes in the floor, and dog feces throughout the house. Moffett also noticed alcohol bottles in the living room and in Mother's bedroom. While there was testimony at the time of trial that Mother had obtained another home, Moffett did not know the condition of that home. Moffett stated that at the time of trial, Mother was unemployed, had failed to maintain employment throughout the case's pendency, and her last job only lasted about three months. According to Moffett, Mother maintains that she is employed making "$15

an hour" but she did not provide any documentation of her employment to the Department or to the trial court.

Moffett testified that she observed the supervised visitations between Mother and the children and believed Mother was "not very consistent" in her interactions with the children. Either Mother was very engaged with the children or would hand the children her phone to watch a movie or let them play on their own while she sat and watched. She stated that Mother appears to love her children and the children appear to love their Mother.

Moffett stated that she conducts monthly face to face visits with Jill's foster parents.[5] She stated that Jill is currently placed in a foster home with three children, ages "2, 2, and 6 months." At the visits, the children are always clean, appropriately dressed, and interacting well with both the other children and the foster family. The foster parents live next door to their adult daughter, and her children provide several playmates for Jill. According to Moffett, the Department's goal is to have an unrelated adoption and believes the current foster home is "a good place" for Jill to be adopted. She stated that the Department's primary goal was to terminate both Mother and Jill's father's parental rights.

---

[5] At the time of trial, Kyle lived with his biological Father, and Jill lived with a foster family.

Moffett stated that after removing Kyle from Mother, he was eventually placed with his Father. She described Kyle as a very typical, active little boy with a wild imagination. She said Kyle was very excited to go stay with his Father and has "done great." Both Kyle's Father and Jill's foster parents work together to maintain a sibling relationship between Jill and Kyle. Moffett described Kyle's Father as "successful" in his participation with the Department and stated that he has alleviated any concerns the Department had about placing Kyle with him by completing his service plan, including completing parenting classes and maintaining consistent employment. The Department's primary goal was for Kyle to remain with his Father and to terminate Mother's parental rights.

Amber Olge testified as a CASA advocate. Olge testified she is an "advocate for . . . abused and neglected children in the court system[,]" and her job in this case was to "see the kids." She was in almost daily contact with the children's current placements and observed the children when they came to the Department offices. She testified that both children are thriving in their new environments and that the children should remain in their current homes. Olge described Kyle as a typical little boy, rambunctious and loves to play outside. Kyle loves his Father and Olge did not have any concerns about Kyle living with his Father. She stated that Kyle's Father has a nice home, and Kyle has his own bed.

Olge described Jill's progress since the Department removed her. She stated that Jill "wasn't very verbal" and that she "whined for things." Jill now can say simple greetings, put sentences together, and knows her colors and numbers.

Olge expressed concerns if the children were placed back with Mother. She stated that Mother's continued drug use, lack of financial stability, and lack of child-appropriate housing demonstrate that it would not be in the children's best interest for them to be returned to Mother. Olge acknowledged that she had not visited Mother's new home, and when she stopped by the home no one answered the door. She also testified that she had not personally talked to Mother about her employment and received her information regarding Mother's employment solely from the Department.

When Olge observed visitation with Mother and the children, she noted that Mother just sat on the couch and let the children watch a movie instead of playing with them. She agreed that the children appear to love Mother, and Mother appears to love her children.

Cedric Vinson testified that he is the supervisor for the Department. Vinson stated that he was involved with this case for almost a year before trial. Initially, the Department was seeking family reunification, but that goal changed for Mother due to lack of progress with the family service plan and her continued drug use. Elaborating, Vinson described the Department's concerns stating "[t]he reason we

7

got involved and that led to the removal [of the children] is because of drug usage[,] . . . [a]nd here we are almost a year into the case, and we're still dealing with a . . . parent that's continuing to test positive for . . . drugs." Vinson explained that because Kyle and Jill have two different fathers, the Department's recommendation was for Kyle to stay with his Father and Mother's rights be terminated. As for Jill, the Department recommended that Mother and Father's parental rights be terminated.

According to Vinson, this is not the first time the Department has been involved with Mother or her extended family, and he believes termination of Mother's parental rights would be in the children's best interest as it would give them permanency without the Department "continuing to intervene[.]" Vinson stated that the Department has worked with Mother for almost a year and Mother cannot demonstrate that she has made "effective changes and . . . show that . . . she can provide a safe and stable home environment for the children." And while Kyle is living with his Father, Jill is still living in a foster home and the Department wants permanency in her life, "so she can thrive in one placement." Vinson testified that it would be in the children's best interest for Kyle to remain with his Father as his sole permanent managing conservator and for the Department to be named permanent managing conservator of Jill, so she can be adopted. He testified that the Department recommended termination of Mother's parental rights to both children.

Kerry, the children's great-grandmother, testified that the children were at her house in March 2019 when the Department removed them.[6] According to Kerry, before the children's removal, Mother lived on and off with Kerry and her husband and they would regularly get the children on weekends or weeklong visits when Mother was not living with them. Kerry stated that after Jill's birth, Mother lived in various towns around Texas, until she moved to Louisiana. Kerry denied knowledge of Mother's drug use before Mother moved to Louisiana. She testified that she was constantly around Mother and did not observe drug use. She was aware that Mother used drugs when she moved to Louisiana with the children. In December 2018, Mother returned to Texas and lived with Kerry and her husband. Although Mother and Jill both tested positive for methamphetamines while living with her, Kerry expressed skepticism of the results stating that she does not allow drugs in her home, that Jill's hair was cut and dropped on the ground before they tested it, and that "[m]aybe it was a false test, a false positive" based on medicine Jill was prescribed.

Kerry testified that she believed it was in the children's best interest to be placed with family. Kerry acknowledged that Mother has a history of drug use, but she testified Mother has a stable home, is currently employed, and the children should be returned to Mother. Kerry stated she did not have any concerns about Kyle

_____

[6] Kerry filed an intervention in the underlying suit but did not file an appeal.

being placed with his Father. Kerry testified she believes Mother is currently drug free because Mother is taking home drug tests.

Kirk, Kyle's Father, testified that Kyle has lived with him almost eight months since the Department removed him from Mother. Kirk testified that initially both Kyle and Jill were placed with him. According to Kirk, although he loves Jill, he felt that she needed a "mother figure in her life" and that "[Jill's] place wasn't with me." When Kyle was placed with Kirk, he was employed as a plumber but has since taken employment at a pest control company because the job provides more stability and is "better suited to taking care of children." He explained that he now lives with his mother and that although he and Kyle share a room, Kyle has his own bed and a large yard to play in. Kyle is currently in Pre-K and is "doing pretty good." Kirk described Kyle as happy and always wanting to help. Kirk confirmed that he and Foster Mother work hard to maintain a sibling relationship between Kyle and Jill. He believes it would be harmful for Kyle to be removed from his home.

Kirk testified that when he was in a relationship with Mother, he had no concerns about her parenting ability, but he could not testify as to her abilities after they separated when Kyle was around a year old. He also could not testify as to the relationship between Mother and Jill as he had not observed them together after the Department removed the children. Kyle explained that Mother would not tell him where she lived after they separated and that any communication or visitations were

facilitated through Kerry and her husband. He noted that at times, even Kerry and her husband did not know where Mother lived. Kirk testified that Mother did not provide any financial assistance for Kyle during the pendency of the case, but she provided clothing, toys, and birthday presents. He believes Kyle should be able to see his Mother if she can "clean" up or remain drug free, and it is "best" for Kyle to maintain his relationship with Mother.

Foster Mother testified that she is married, and they currently have three children living in their home, Jill, Jill's six-month-old sister, and Foster Mother's adopted two-year-old grandson. She stated that she also had Kyle in her household before he went to live with his Father. She testified Kyle comes over to ride to school with her daughter's children every day of the week except Mondays.

Foster Mother described her home as a "wood frame home" with five bedrooms and two full baths. She testified that her neighborhood is rural and with five neighbors on a dead-end street. Jill and her six-month-old sister sleep in their own room and each child has their own crib. Foster Mother described Jill as a "joy" and "full of life." Foster Mother testified that Jill loves dolls and has a large collection since moving into her home.

According to Foster Mother, Jill was not very verbal when she arrived and would whine, but since Foster Mother has started working with her, she can now verbally communicate much more effectively, and Jill is hitting all of her milestones.

She stated that Kyle is a "happy" and "adventurous" little boy and that he and his sister have a great relationship. Foster Mother testified that Kyle was excited to go live with Father and even had a "countdown" of the days until he left his foster home. Foster Mother's goal would be to adopt Jill. She stated that she would also be willing to adopt Kyle, but assumes because he went back to his Father, "that's where he would stay." She also stated she would work to maintain a sibling relationship between Jill and Kyle if she adopts Jill and Kyle remains with his Father.

Mother did not testify at trial. She invoked her Fifth Amendment right to remain silent. Several other witnesses testified at trial, but we only address the testimony in relation to termination of Mother's parental rights to Jill and Kyle.

After the completion of testimony, the jury returned a verdict to terminate Mother's parental relationship to Jill and Kyle, to name the Department permanent managing conservator of Jill and to name Kirk permanent managing conservator of Kyle. The trial court entered a judgment in accordance with the jury's verdict. Mother timely appealed. *See* Tex. R. App. P. 26.1.

## Best Interest

In her sole issue, Mother challenges the jury's findings regarding the children's best interest, arguing that "[t]his case is a perfect example of overreach by the Department." Mother contends that the Department failed to prove by clear

12

and convincing evidence that termination of her parental rights to the children is in their best interest.

**Waiver**

In response to Mother's brief, the Department argues that Mother cannot challenge the legal and factually sufficiency of the evidence regarding best interest on appeal as she failed to preserve the argument for review. The Dallas Court of Appeals recently addressed the issue of preservation of legal and factual sufficiency review on appeal in a parental termination jury trial.

> Factual sufficiency issues must be preserved by new trial motion. The clerk's record does not contain a new trial motion, nor does the computer generated docket sheet indicate that any such motion was filed. Mother did not preserve a factual sufficiency argument.
>
> A legal sufficiency argument can be preserved by: (i) a motion for instructed verdict, (ii) a motion for judgment notwithstanding the verdict, (iii) an objection to a jury question's submission, (iv) a motion to disregard a jury's answer to a vital fact issue, or (v) a new trial motion. Here, nothing in the record indicates that Mother made any of these motions or objections. Accordingly, Mother did not preserve a legal sufficiency argument.

*In re A.P.*, No. 05-19-01536-CV, 2020 WL 3071708, at *5 (Tex. App.—Dallas June 10, 2020, no pet.) (mem. op.) (citations omitted). A review of the record before us shows that Mother did not properly preserve her legal and factually sufficiency arguments for review as the record does not include "(i) a motion for instructed verdict, (ii) a motion for judgment notwithstanding the verdict, (iii) an objection to

13

a jury question's submission, (iv) a motion to disregard a jury's answer to a vital fact issue, or (v) a new trial motion[.]" *Id.*

Nonetheless, in the interest of justice, assuming without deciding that Mother properly preserved her complaints for appeal, our review of the record indicates her arguments lack merit. *See In re C.L.*, No. 07-14-00180-CV, 2014 WL 5037982, at *4–5 (Tex. App.—Amarillo Oct. 7, 2014, no pet.) (mem. op.) (determining that mother failed to preserve her legal and factual sufficiency claims for review on appeal but concluding that even if appellant had properly preserved her issues, her arguments lacked merit).

**Analysis**

"[T]here is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (citing Tex. Fam. Code Ann. § 153.131(b)). "To terminate parental rights, the Department must prove by clear and convincing evidence that 1) a parent committed at least one predicate act or omission harmful to the child, and 2) the termination of parental rights is in the child's best interest." *In re T.N.*, 180 S.W.3d 376, 382 (Tex. App.—Amarillo 2005, no pet.) (citing Tex. Fam. Code Ann. § 161.001).

> The clear and convincing standard does not mean that the evidence must negate all reasonable doubt or that the evidence must be uncontroverted[,] [and] [t]he reviewing court must recall that the trier of fact has the authority to weigh the evidence, draw reasonable inferences therefrom, and choose between conflicting inferences.

*Id.*

14

As Mother only challenges the sufficiency of the evidence to support the jury's finding that termination is in the children's best interest, we narrow our focus upon review solely to that issue. In reviewing whether termination is in a child's best interest, we consider a non-exhaustive list of factors: (1) desires of the child; (2) emotional and physical needs of the child now and in the future; (3) emotional and physical danger to the child now and in the future; (4) parental abilities of the individuals seeking custody; (5) programs available to assist these individuals to promote the best interest of the child; (6) plans for the child by these individuals or by the agency seeking custody; (7) stability of the home or proposed placement; (8) acts or omissions of the parent which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). "[T]he prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest." *In re F.A.B.*, No. 05-14-01277-CV, 2015 WL 631165, at *3 (Tex. App.—Dallas Feb. 13, 2015, pet. denied) (mem. op.) (citing Tex. Fam. Code Ann. § 263.307(a)).

The list is not exhaustive, but simply indicates considerations that have been or could be pertinent. *Holley*, 544 S.W.2d at 372. However, the best-interest determination neither requires proof of any unique set of factors nor limits proof to any specific factors. *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001,

15

no pet.) (citing *Holley*, 544 S.W.2d at 371–72). There is no requirement that the party seeking termination prove all nine factors. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). "While no one factor is controlling, analysis of a single factor may be adequate in a particular situation to support a finding that termination is in the best interest of the child." *In re R.J.*, 579 S.W.3d 97, 114 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (citations omitted). An appellate court need only address the *Holley* factors that are relevant to the evidence presented. *See In re J.D.*, No. 06-18-00105-CV, 2019 WL 1302932, at *8 (Tex. App.—Texarkana Mar. 22, 2019, no pet.) (mem. op.). "[I]n conducting the best-interest analysis, a court may consider not only direct evidence but also may consider circumstantial evidence, subjective factors, and the totality of the evidence." *In re R.J.*, 579 S.W.3d at 114 (citation omitted).

A jury can give "'great weight' to the 'significant factor' of drug-related conduct." *In re K.C.,* 219 S.W.3d 924, 927 (Tex. App.—Dallas 2007, no pet.) (quoting *Dupree v. Texas Dep't of Protective and Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ)). "A parent's drug use, inability to provide a stable home, and failure to comply with a family service plan support a finding that termination is in the best interest of the child." *In re M.R.*, 243 S.W.3d 807, 821 (Tex. App—Fort Worth 2007, no pet.) (citation omitted). Additionally, "[a] parent's drug use supports a finding that termination is in the best interest of the child." *In re*

*E.R.W.* 528 S.W.3d 251, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (citation omitted).

Testimony at trial established that Mother and Jill's positive drug tests for methamphetamine, when Jill was less than 24 months old, led to the removal of Kyle and Jill from Mother's custody. Despite Mother completing the inpatient portion of rehabilitation, she missed eight required follow-up appointments, and was removed from the system before completing the entire program. During the case's pendency, when Mother knew her proper conduct was imperative to regaining possession of her children, she continued to test positive for illegal substances. Notably, she tested positive for marijuana as late as December 2019, only two months before trial. Mother's continued drug use and failed attempts to follow her service plan's requirement to address her substance abuse addiction provides strong evidence that terminating Mother's parental rights is in the children's best interest. "[E]vidence of [Mother's] continuing drug and alcohol abuse supports a finding that she poses a present and future risk of physical or emotional danger to the child and that termination would be in the best interest of [the child]." *In re S.N.*, 272 S.W.3d 45, 53 (Tex. App.—Waco 2008, no pet.) (citations omitted); *see also In re A.M.L.,* No. 04-19-00422-CV, 2019 WL 6719028, at *4 (Tex. App.—San Antonio Dec. 11, 2019, pet. denied) (mem. op.) (explaining that a parent's drug use "is relevant to multiple *Holley* factors, including [the child's] emotional and physical needs now

17

and in the future, the emotional and physical danger to [the child] now and in the future, [the parent's] parental abilities, the stability of [the parent's] home, and the acts or omissions which may indicate an improper parent-child relationship"); *In re K.J.C*, Nos. 07-18-00395-CV, 07-18-00400-CV, 2019 WL 946396, at *3 (Tex. App.—Amarillo Feb. 26, 2019, pet. denied) (mem. op.) (explaining that there was "strong support" showing that termination was in the child's best interest because although Mother participated in drug rehab, she failed to complete her treatments and continued to use drugs); *In re N.R.V.*, No. 04-14-00844-CV, 2015 WL 2255088, at *3 (Tex. App.—San Antonio May 13, 2015, no pet.) (mem. op.) (explaining that a parent's positive drug test supports the trial court's conclusion that termination is in the child's best interest).

The ability for a parent to provide a safe and stable home environment "is the paramount consideration in assessing the best interest of the children." *In re L.W.*, No. 01-18-01025-CV, 2019 WL 1523124, at *18 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, pet. denied) (mem. op.) (citations omitted). Evidence at trial showed that although Mother was not living with Kerry anymore, her home was inappropriate for her children, as it was covered in trash and animal feces with visible holes in the home's floor. While there was testimony that the Department and CASA did not visit Mother's new home before trial, a jury could reasonably disregard any recent attempt by Mother to provide appropriate housing in light of her history of

18

instability or inadequate housing before the Department's involvement. *See In re S.R.*, 452 S.W.3d 351, 368 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("Even if the [the parent's] new home had been determined to be appropriate, the factfinder may conclude that a parent's changes shortly before trial are too late to have an impact on the best-interest determination."). Additionally, Mother failed to demonstrate that she can provide continued financial stability for the children. Mother only gave the Department proof of employment for three months during the pendency of the case. The Department could not confirm that Mother was continually employed, because she failed to provide any documentation to substantiate her claim that she made "$15 an hour."

There was also evidence regarding Mother's lack of parental abilities. Testimony showed that when the children entered foster care, Jill was nonverbal and only whined to communicate, while Kyle had to attend play therapy. Mother did not provide any evidence of a plan for the children's childcare while she worked. The evidence regarding Mother's lack of stable employment and parenting skills, coupled with the description of Mother's home, demonstrate Mother's inability to care for her children or provide a stable home for them. Additionally, Mother's continued abuse of illegal drugs, even during the pendency of this case, shows poor parenting judgment. "A parent's inability to provide adequate care for her children, unstable lifestyle, lack of a home and income, lack of parenting skills, and poor

19

judgment may be considered when looking at the children's best interest." *In re J.D.*, 436 S.W.3d 105, 119 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing *In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App—Fort Worth 2003, no pet.)).

While there was testimony that Mother loved her children and the children loved Mother, evidence also showed that Mother's interactions with the children during visitation were inconsistent, taking a more inactive approach and allowing the children to watch movies on her phone or play by themselves during her limited visitation time. *See In re M.L.R-U., Jr.*, 517 S.W.3d 228, 239 (Tex. App.—Texarkana 2017, no pet.) (noting that Mother's lackluster visitation with her children, passive interaction and use of cell phone during visitation, demonstrated disinterest in regaining custody and weighted in favor of termination of mother's parental rights). Even so, evidence of a parental bond between parent and child does not "outweigh the significant evidence supporting the finding that termination of Mother's parental rights was in the children's best interest" in light of other evidence "that Mother did not take advantage of opportunities to visit the children when allowed." *In re D.L.T.*, No. 01-15-00845-CV, 2016 WL 888768, at *8 (Tex. App.—Houston [1st Dist.] Mar. 8, 2016, no pet.) (mem. op.); *see also In re D.W.*, 445 S.W.3d 913, 926 (Tex. App.—Dallas 2014, pet. denied) (stating "evidence that a child loves a parent and enjoys visits is only marginally relevant to a best interest finding").

At the time of trial, the children were five and two, respectively. While they were too young to express their desires, testimony showed that both children's needs are met, they are happy, and thriving in their current placements. The Department wanted both children to remain in their current placements, with Kyle staying with his Father and Jill eventually being adopted by her foster family.

Testimony showed that Kyle was very excited to live with his Father and when he was briefly sent to foster care, Kyle had a "countdown" to when he would be reunited with his Father. Kyle's Father testified that although he would like to continue to allow Mother to have a relationship with Kyle, she would have to be drug free to get visitation. Kyle's Father testified that Kyle is happy, enjoys school, and has a close relationship with his sister and her foster family. Kyle sees his sister several days a week. Kyle's Father said he lives with his mother and Kyle has his own bed and a large yard to play in. The Department and CASA expressed no reservations about Kyle staying with his Father permanently and believed that it would be in his best interest to continue living with Father. *See In re A.F.R.*, No. 01-20-00355-CV, 2020 WL 6140181, at *11 (Tex. App.—Houston [1st Dist.] Oct. 20, 2020, no pet. h.) (mem. op.) (explaining that a "paramount consideration" in the best interest determination is if the child is in a "stable, safe, and permanent home").

There was also testimony that Jill is flourishing in her foster home. The Foster Mother described Jill as a joy and said that she is very bonded to her foster brother.

21

The Foster Mother said that Jill has her own crib in a room that she shares with her baby sister and many neighborhood playmates. The Foster Mother stated she would continue to work with Kyle's Father to maintain a sibling relationship and that Kyle regularly visits her home to ride to school with her grandchildren. Foster Mother also indicated she would like to adopt Jill in the future. *See In re R.J.*, 579 S.W.3d at 115 (evidence showed that termination of the mother and father's parental rights was in the child's best interest because the child was bonded with his foster family, the foster family provided a "stable and loving home[,]" wished to adopt the child, and worked to facilitate a relationship between the child and his sibling).

The evidence is legally and factually sufficient to support the jury's finding that termination of Mother's parental rights to both Kyle and Jill is in the children's best interest by clear and convincing evidence. We overrule Mother's sole appellate issue and affirm the trial court's judgment.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on October 6, 2020
Opinion Delivered November 5, 2020

Before Kreger, Horton, and Johnson, JJ.

22