

# NUMBER 13-20-00566-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF G.C., J.C., A.C., A.C., CHILDREN

### On appeal from the 343rd District Court of Bee County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Tijerina**
**Memorandum Opinion by Justice Tijerina**

Appellant father K.C. appeals the trial court's order terminating his parental rights to his four children G.C., J.C., A.R., and A.B.[1] By his sole issue, appellant argues the evidence is factually and legally insufficient to support a finding that termination of the parent-child relationship was in the best interest of the children. *See* TEX. FAM. CODE ANN.

---

[1] We use pseudonyms or initials to refer to appellant, the child, and other family members. *See* TEX. FAM. CODE ANN. § 109.002(d); *see also* TEX. R. APP. P. 9.8. We use different initials to distinguish the different children with the same initials.

§ 161.001(b)(2). We affirm.

## I. BACKGROUND

**A.    First Removal**

Marilyn Anderson, an investigator with Texas Department of Family and Protective Services (Department), testified that the children were removed from Mother and her paramour, E.E., in March of 2018 for physical abuse and continuous domestic abuse. The Department's petition alleged Mother and E.E. were evicted from their apartment, were moving from hotel to hotel with the children, and family members would send funds to the couple to pay for the rooms. The Department sought termination of both Mother and appellant's parental rights. When the Department filed the first petition for removal, G.C. was eleven years old, J.C. was eight years old, A.B. was six years old, and A.R. was two years old. On April 26, 2018, the trial court held an adversary hearing at which Mother and appellant appeared. On May 16, 2018, the trial court ordered the children removed and ordered Mother and appellant to complete counseling services and parenting classes; submit to random drug testing; obtain proper housing for the children; and complete their family service plan which included, among other things, obtaining lawful, steady employment, attending visitation, and cooperating with the Department.

In January 2019, E.E. was sent to jail for drug charges. On March 28, 2019, the children were placed back in Mother's care with the condition that they were to have zero contact with E.E. After E.E.'s release, he continued to reside with Mother, picked up the children from school, and had frequent contact with the children. After E.E. informed the school that the children would begin to be homeschooled, the school contacted the

Department. The children made outcries that they witnessed domestic violence between Mother and E.E., and the Department found there was "reason to believe" these allegations. Maria Fernandez, the Department's caseworker, testified that Mother never sought a protective order from E.E. despite him being a "very violent man." According to Fernandez, the children were afraid of E.E. and feared he would potentially kill Mother.

## B. The Department's Testimony

The Department removed the children from the home again on May 24, 2019, and the children were later placed with appellant for approximately two months.[2] Fernandez stated that appellant told her physical altercations had occurred between him and E.E. a few times. She stated that appellant never had a home that was appropriate for the children and that he had a pending charge for sexual abuse, which she believes was ultimately dismissed. For these reasons, the Department could not recommend that the kids live with him during the removal process. She also had concerns regarding appellant's lack of stable employment.

Fernandez believed family services, such as parenting classes and individual counseling, were necessary because the children expressed to her that appellant was not involved in their lives like he should have been. She testified that although appellant did some of the tasks in his service plan, "there would be times where he would attend his visitation," and "there would be time[s] where he wouldn't." Because he visited the children only forty percent of the time, Fernandez stated he was not in compliance with his service plan. Although Fernandez stated that appellant was making "progress," she

_____

[2] It is unclear during which two months the children resided with appellant.

3

believed appellant needed to make one hundred percent effort—as opposed to forty percent—to show stability and protectiveness. It was her opinion that appellant did not learn the skills necessary to protect the children. Fernandez also testified that, at one point, appellant did not want and refused to participate in counseling sessions. She opined that termination of his parental rights was in the children's best interest.

Olivia Cote, another Department caseworker, stated that appellant completed some of his service plan. For example, he obtained an apartment through the housing department after his family paid off his debt, but she was concerned about his "on and off" employment. Appellant was unable to provide her with paystubs because he stated he had not been working for three weeks prior to the trial. Cote testified that while the children were living with appellant during the two months, they needed help. Cote explained that appellant called law enforcement on A.B. multiple times due to his inability to manage her behavior, and appellant would call Cote every weekend and on holidays asking for help because appellant did not know what to do with the children.

Cote testified that after appellant agreed he needed additional assistance with parenting the children, the Department added parenting services to appellant's service plan in October 2019. However, appellant did not begin the parenting classes until January 2020. Thereafter, he attended another class in March and did not attend any classes in the summer. Cote was concerned because appellant only attended parenting classes when he was scheduled to appear in court, and he waited until after August— when termination proceedings began—to complete the classes. Cote stated that out of fifty-three total visits with the children that the Department offered him, appellant only

4

attended twenty-three visits—less than half.

Cote stated that appellant's lack of bonding with the children was another concerning factor. J.C. specifically told her that he did not think appellant "will ever be able . . . [to] raise [the children] and care for them and meet all their needs." In fact, Cote stated that appellant agreed with the Department that it was best to place the children in foster care instead of his home. When asked if appellant had learned anything from his parenting classes, Cote stated he did not. For example, he would consistently upset J.C. during his visits by insisting they talk about school, which J.C. expressed he did not want to talk about. She expressed that J.C. feared going back to appellant. When Cote questioned G.C. about potential adoption, G.C. stated she was "definitely up for that" as long as "it was a loving foster home [like] she has now."

Deanna Kimes, a volunteer for CASA, testified that she has spent over two hundred hours on this case. She interviewed appellant several times, and he "objected to any conversation with [her]. He was very rude and very—some of his language was rather vile." She went over to his apartment, and she found that A.B. was put in a closet as a form of punishment. She also observed that the children had several markings on their legs. Kimes stated the children claimed the markings were made by appellant with a fly swatter and a belt buckle as punishment. Kimes stated that appellant first beat G.C. with a belt buckle when she was only three-and-a-half years old.

She testified that she bought the kids clothes and shoes because they wanted to play sports, but the next time that she visited them, everything she bought for them was gone. Kimes stated that appellant denied seeing the clothes, and he denied that she

5

purchased them for the children although she had receipts and witnesses to prove that she did. She believed that appellant had sold the clothing and shoes.[3]

Kimes stated that the children mostly tell her they wish to stay with their foster parents. Based on her observations of appellant and the children, it was her opinion that appellant showed no compassion or parental relationship with the children. For instance, she noticed that appellant would just sit on the couch and watch television while the children played, and for no reason, would just constantly yell at the children. According to Kimes, appellant failed to interact with the children or pay any attention to them other than to yell at them. Kimes opined that termination was in the best interest of the children because they deserved "love and kindness."

## C. Licensed Counselors' Testimony

Professional counselor Julia Gutierrez, Ph.D. started servicing A.R. in January 2020 due to behavioral problems she was experiencing in school and at home, such as hitting other children, stealing, urinating everywhere except the toilet, and anger issues. When A.R. first appeared in her office, she was very hesitant with Dr. Gutierrez. A.R. would cling to her foster mother, she would hide under the desk or chair, she would put her head down, or she would lay down on the floor.

After A.R. finally opened up, she expressed to Dr. Gutierrez that she was angry and scared though she could not explain why. Dr. Gutierrez believed that A.R.'s behavior, including her anger and fear, depended on the exposure she had at home and the changes in the environments she had experienced. Dr. Gutierrez expressed no opinion

---

[3] Cote also testified that appellant had previously pawned the children's belongings.

6

as to whether appellant's parent-child relationship should be terminated because she had no affiliation with appellant. However, she did express that it would be in A.R.'s best interest "to stay away from that type of environment" that led to her behavior.

Beginning November 2019, a licensed professional counselor, Jeffrey K. Moen, counseled A.B., J.C., and G.C. Regarding G.C., Moen stated that she would frequently wet the bed, was angered easily, and was aggressive with her siblings. Similarly, J.C. was angered easily and felt frustrated with his sisters. He attributes the anger issues to the children being in and out of different foster homes throughout the years, which is a big stressor, as well as the separation from family. Moen opined that the children going back to their previous situation, with appellant or Mother, would endanger the children's wellbeing. He testified that in March of 2020, he recommended that the visits between the children and appellant and Mother stop because he felt the children were being coached and discouraged from interacting with him or the foster parents.

Like Dr. Gutierrez, Moen expressed no opinion regarding the termination of the parent-child relationship because he had not met either parent. Moen did, however, express that the children were in a supportive environment with their foster family; they felt comfortable, safe, and secure. He also actively communicates with the foster parents, which he believes is very important for the children. He would anticipate a regression in their therapy with a change from their current placement. Moen claims the children are improving—they are reducing aggressive behavior, and they argue less.

## D.    Appellant's Testimony

Appellant testified that he has a total of eight children, four of which are the subject

of this appeal. He admitted that he did not regularly pay child support due to lack of work. According to appellant, although in the last four months he has begun remodeling and painting homes as a source of income, he still has not paid child support. When the Department started termination proceedings, appellant stated that the children were placed with him for two months: "[I]t was all of a sudden. So I wasn't prepared for it. Not like I am now." He admitted that at the time he did not have the skills necessary to care for the four children, and there was one instance where he had trouble managing A.B.'s behavior, so he told her he would have a police officer come and speak to her.

Because appellant was not very involved in the children's lives over the last few years, he stated the Department offered him services such as parenting classes and counseling, which he eventually completed and obtained a certificate for. Regarding visitation with the children, appellant stated that he missed only three visits due to his conflicting work schedule even though caseworkers testified he missed over half his visits. Appellant agreed that the children have been in the Department's custody for over two-and-a-half years but stated that he has recently changed, and he believes he is now able to provide stability because he has gotten his priorities straight and is able to give them his full attention. He claimed that he currently lives in a three-bedroom apartment under housing authority. As far as transportation, he stated that he is looking into taxis and lives right by a bus stop, which would aid him in getting the children where they need to be. Appellant also stated his oldest son, twenty-nine-year-old James, was willing to assist him and care for the children.[4]

---

[4] There was testimony at trial that James has two children of his own.

**E.  Foster Parent Testimony**

The children's foster mother, Valerie, testified that the children had a lot of lice when they initially came to her home and were disrespectful towards each other. She has noticed positive changes in all the children since their placement with her. For example, G.C. would wet the bed at thirteen years old, but she stopped now. G.C. felt overwhelmed as the caregiver of the children, but once Valerie explained that it was not G.C.'s role to be the children's mother, G.C. has felt relief, now bonds with Valerie, and has let go of the burden of being the caregiver. J.C. is now "very kind" and does not anger as easily. Initially, A.R. would throw tantrums of up to forty-five minutes, four to five times a day, but she has improved ever since a routine with Valerie was developed.

**F.  Trial Court Findings**

Following a bench trial, the trial court found by clear and convincing evidence that appellant: (1) engaged in conduct or knowingly placed the children with persons who endangered the physical or emotional well-being of the children; (2) constructively abandoned the children who had been in the permanent or temporary managing conservatorship of the Department for not less than six months and the Department made reasonable efforts to return the children to appellant, appellant has not regularly visited or maintained significant contact with the children, and appellant has demonstrated an inability to provide the children with a safe environment; (3) failed to support the children financially; and (4) failed to comply with the provisions of its order that specifically established the actions necessary for appellant to obtain the return of the children. *See* TEX. FAM. CODE ANN. §§ 161.001(b)(1)(E), (b)(1)(F), (b)(1)(N), (b)(1)(O). The trial court

9

further found that termination of the parental rights of appellant and Mother was in the best interest of the children. *See id.* 161.001(b)(2). This appeal followed.[5]

## II.     BEST INTEREST

Appellant does not challenge the predicate grounds for termination under Texas Family Code §§ 161.001(b)(1)(E), (F), (N), and (O). Instead, by a single issue, appellant argues that the evidence was legally and factually insufficient to support the trial court's determination that it was in the best interest of the children to terminate his parental rights. *See id.*

### A.     Applicable Law

Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see In re D.S.P.*, 210 S.W.3d 776, 778 (Tex. App.—Corpus Christi–Edinburg 2006, no pet.). Termination of the parent-child relationship must be supported by clear and convincing evidence. *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). The "clear and convincing" intermediate standard falls between the preponderance of the evidence standard of civil proceedings and the reasonable doubt standard of criminal proceedings. *Porter v. Tex. Dep't of Protective & Reg. Servs.*, 105 S.W.3d 52, 57 (Tex. App.—Corpus Christi–Edinburg 2003, no pet.). Clear and convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN.

---

[5]  The trial court also terminated Mother's rights. Mother is not a party to this appeal.

§ 101.007.

In our legal sufficiency analysis, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *See In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). We assume the finder of fact resolved all disputed facts in favor of its finding, if a reasonable factfinder could do so; likewise, we disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* In our factual sufficiency analysis, "[w]e must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated a provision of section 161.001(1) and that the termination of the parent's parental rights would be in the best interest of the child." *In re M.C.T.*, 250 S.W.3d 161, 168 (Tex. App.—Fort Worth 2008, no pet.) (citing *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002)). Under this standard, we consider whether the disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *Id.* If the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *In re J.F.C.,* 96 S.W.3d 256, 266 (Tex. 2002).

In reviewing a best interest finding, we consider the non-exclusive *Holley* factors. *See In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012) (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). These factors include: (1) the children's desires; (2) the children's emotional and physical needs now and in the future; (3) any emotional and physical danger to the children now and in the future; (4) the parental abilities of the

11

individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the best interest of the children; (6) the plans for the children by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *Id.*

**B.    Discussion**

### 1.    The Desires of the Children

The record shows that none of the children expressed a desire to return to appellant. Cote testified that J.C. was mostly quiet during his scheduled visits because he had a lot of resentment towards his parents: she said "he just wishes they could have done better. So he doesn't really show much emotion." She also testified that J.C. "fears going home to his dad." *See In re C.N.S.*, 105 S.W.3d 104, 106 (Tex. App.—Waco 2003, no pet.) (considering the evidence of a lack of an emotional bond between the children and the parent as relevant in determining the child's desires). There was testimony that A.B. is now always happy. Although she enjoys talking to her parents, she has never asked when she can return home to them. G.C. expresses frustration during her visits with her parents, especially when they talk about A.R. and how G.C. needs to help her because A.R. is still a baby. G.C. was one of the main caregivers of her sisters before she was placed in the foster care system. In a written activity, G.C. expressed that she dreamed of "A better life. And then [to] have [a] happy family with no fighting." She also expressed that her current foster family cares for her. Because none of the children have expressed a desire to return to appellant, and some of the children have expressed their

12

desire to remain with their current placement, we weigh this factor in favor of termination.

## 2. The Emotional and Physical Needs of the Children and the Emotional and Physical Danger to the Children.

Appellant does not challenge the trial court's findings that he engaged in conduct or knowingly placed the children with persons who endangered the physical or emotional well-being of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). "While it is true that proof of acts or omissions under [§] 161.001(1) does not relieve the petitioner from proving the best interest of the child, the same evidence may be probative of both issues." *In re C.H.*, 89 S.W.3d at 28; *see In re D.L.N.*, 958 S.W.2d 934, 934 (Tex. App.—Waco 1997, pet. denied) (holding that a factfinder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent). Based on the record and appellant's own admissions, appellant permitted the children's exposure to violence and abuse. Kimes described E.E. as a "monster" who would abuse the children horrifically. In fact, appellant testified that, at one time, E.E. threatened him with a knife, and yet despite these observations, appellant would leave the children with Mother and E.E. *See In re C.J.F.*, 134 S.W.3d 343, 354 (Tex. App.—Amarillo 2003, pet. denied) (providing that a parent's failure to protect their children from abuse is evidence supporting the best interest finding).

In addition, Anderson, Fernandez, Cote, and Kimes all testified regarding various concerns about appellant's ability to protect the children and meet their needs. Kimes stated she had never seen appellant nurture the children in her presence. Rather, "[h]e watches TV and then screams at them to be quiet." She further stated that appellant "has never interacted with the children" in her presence, and she believed sold the clothing

13

she had purchased for them. Cote was concerned because appellant demonstrated that he did not know J.C. very well, which caused a big strain in the relationship. She opined that "the children need to be able to move on so they can have a happy, healthy successful life." Furthermore, Cote was concerned because appellant needed to call the police on his seven-year-old daughter multiple times, which in her opinion, demonstrates his inability to manage the children. Cote also found it concerning that appellant delayed completing his classes until after termination proceedings began. Appellant has also missed over fifty percent of his visits over a two-year period and admitted he did not support the children financially.

In sum, the record established that the children's physical and emotional well-being was endangered on numerous occasions. Appellant allowed the children to be exposed to verbal, physical, and domestic abuse with Mother and E.E. although appellant knew that it was not in the children's best interest. Furthermore, the record includes ample testimony of appellant's poor parenting abilities exhibited both before and during the case—including lack of child support, sporadic visitation, questionable discipline practices, making false promises, and selling their clothes among others—from which the trial court could have determined he could not meet their present and future physical and emotional needs. *See In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.). The second and third *Holley* factors weigh in favor of termination.

### 3. Parental Abilities of the Individuals Seeking Custody

As discussed above, the caseworkers all testified concerning appellant's lack of parental abilities. According to their testimony, appellant did not pay child support for the

children even when he was working, and his driver's license is currently suspended because he has failed to pay child support. Appellant admitted that when he had the children for two months, caring for the children was too much for him to handle, so he returned the children to the Department. Appellant's practice of using questionable discipline techniques persisted as evident by his contacting police to handle A.B.'s behaviors, putting another child in the closet, leaving marks on the children's legs, and hitting them with a belt buckle and fly swatter.

As Cote commented, there is a considerable risk that appellant would not be able to handle the children and that "if he needed help, he wouldn't have anyone in the area to help him." In this regard, appellant testified that he "used to have [his] mom around," but he does not have her around anymore. Despite not having a support system, appellant stated that if he "ever need[s] information or any help [he] know[s] that [he] can look to— to our Lord" for guidance and support. Kimes's biggest concern was the dishonesty appellant displayed with the children during his visits, which she opined was hurtful to the children:

> The biggest concern is false hope. They promise the children a lot of things that have—they've never been able to give the children in the past, or they have given to them and then they've taken them away and pawned them for money. So there's a lot of false hope that happens during those visits.

The fourth *Holley* factor weighs in favor of termination.

### 4. Programs Available to Assist the Individuals Seeking Custody to Promote the Best Interest of the Children

The record established that counseling and parenting classes were made available to appellant and that he attended the counseling and completed the parenting classes as

required under the family service plan. However, Cote testified that his parental abilities did not improve as a result of taking the parenting class. Moreover, there was testimony presented that appellant only completed the services required of him within the last sixty days and waited until after termination proceedings began. Furthermore, Moen testified that "If the parent does not want to work with the—[Department] and take advantage of the supports that are available and therapies that are available [to] the[m] that is concerning certainly." *See In re W.E.C.*, 110 S.W.3d 231, 245 (Tex. App.—Fort Worth 2003, no pet.) (considering a parent's failure to use the programs available to her and the Department's opinion that the parent "did not have the ability to motivate herself to seek out available resources" in determining whether termination was in the best interest of the child). Appellant also squandered more than half of his scheduled visits with the children because he was "shopping at Wal Mart" or driving around, which had a negative impact on the children. *See In re M.L.R.-U.*,517 S.W.3d 228, 239 (Tex. App.—Texarkana 2017, no pet.) (noting that mother's lackluster visitation with her children and passive interaction with them demonstrated a disinterest in regaining custody and weighted in favor of termination of mother's parental rights). The fifth *Holley* factor weighs slightly in favor of termination.

### 5. Plans for the Children of the Individuals or the Agency Seeking Custody

Appellant explained some of his plans to protect the children and provide for their needs in the future. But it was the factfinder's prerogative to assess appellant's credibility, considering appellant had been dishonest with the Department, with the children, and in his testimony regarding his missed visitation. *See In re N.T.*, 474 S.W.3d 465, 475 (Tex.

App.—Dallas 2015, no pet.) (deferring to the factfinder's determinations as to witness credibility). Furthermore, appellant testified his mother is no longer around to assist with the children. Even though the Department is investigating several relatives and searching for a compatible match, the Department admitted that there is currently no family lined up to adopt the children. Instead, the Department plans to keep the children with their current foster family. The Department intended to perform a home study on James, after he obtained a larger home, noting he had recently moved closer to the children and obtained a new full-time job. Cote noted that the children were eager to speak to James and hoped that they could be placed with him. The sixth *Holley* factor weighs slightly in favor of termination.

### 6. Stability of the Home or Proposed Placement

The record established that appellant now has a suitable three-bedroom apartment for the children. However, there was testimony that appellant only obtained this home because family members paid off his debt. Although appellant claims to have steady income, appellant was unable to provide proof of income, and has yet to pay any child support. So, while appellant may provide adequate housing, he is unable to show proof of employment. Also concerning to the Department was that appellant stated he would quit working if needed to tend to the children because appellant needs to work to provide for the children. This factor is neutral.

### 7. The Acts or Omissions of the Parent that May Indicate that the Existing Parent-Child Relationship is not a Proper one and any Excuse for the Acts or Omissions of the Parent.

There was testimony that appellant would tell the children he would visit them and

17

then he did not, which discouraged and upset the children. While a few missed visits were due to appellant's work, some excuses he gave the Department were because he was "driving his car" or "shopping at Wal Mart," which indicate appellant's lack of attention to the children. Furthermore, the children have spent over two-and-a-half years in the foster care system. Appellant does not offer any excuses for his overall behavior but only claims that he has gotten his priorities straight now. Appellant was seemingly aware that the children were endangered by being with Mother and E.E. but disregarded that risk and permitted the children to reside with them. *See In re C.D.E.*, 391 S.W.3d 287 (Tex. App.—Fort Worth 2012, no pet.). The eighth and ninth factors weigh in favor of termination.

**C.   Summary**

Looking at the evidence of the *Holley* factors in the light most favorable to the trial court's verdict, we conclude that the evidence is legally sufficient because a reasonable trier of fact could form a firm belief or conviction that termination was in the best interest of the children. *See In re J.O.A.*, 283 S.W.3d at 344. In reviewing the trial court's decision for factual sufficiency, we have considered evidence of appellant's attempts to improve his parenting abilities by attending counseling and parenting classes as outlined in his family plan, as well as evidence that he now has a home for the children. While he engaged in parenting and counseling services, appellant did not demonstrate any changes in his behavior or parenting abilities. While appellant has adequate shelter for the children, he is unable to provide proof of income. The record reflected that appellant repeatedly failed to protect the children from several different types of abuse, failed to support the children, and maintained an inconsistent, unreliable relationship with them.

Furthermore, several caseworkers and counselors expressed concerns with returning the children back to their parents. Viewing the evidence in the light most favorable to the judgment, assuming that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and disregarding all evidence that a reasonable factfinder could have disbelieved or found to have been incredible, *see In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005), we conclude that the evidence is factually sufficient because the disputed evidence regarding the *Holley* factors is not so significant that it would prevent a reasonable factfinder from forming a firm belief or conviction that termination was in the children's best interests. *See id.* We overrule appellant's sole issue.

### III. CONCLUSION

We affirm the trial court's judgment.

JAIME TIJERINA
Justice

Delivered and filed on the
13th day of May, 2021.