# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00324-CV

---

**A. W., Appellant**

v.

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 146TH DISTRICT COURT OF BELL COUNTY
NO. 318,020-B, THE HONORABLE CHRISTOPHER L. CORNISH, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

A.W. (Mother) appeals from the trial court's decree of termination.[1]  Following a bench trial, the trial court terminated Mother's parental rights to her children, C.E. (Son) and A.E. (Daughter), finding that statutory grounds existed for termination of the parent-child relationship, *see* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), (P), and that termination of Mother's parental rights was in her children's best interest, *id.* § 161.001(b)(2).  Mother does not contest the trial court's statutory-grounds findings.  Her sole issue challenges the legal and factual sufficiency of the evidence to support the trial court's best-interest finding.  For the following reasons, we affirm the trial court's decree of termination.

---

[1]  We refer to A.W. and her children by their initials or as Mother, Son, and Daughter. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.  The parental rights of the children's father (Father) also were terminated in the trial court's decree, but he is not a party to this appeal.

## BACKGROUND

Three days after Daughter was born in June 2020, the Department of Family and Protective Services filed an original petition in a suit affecting the parent-child relationship and sought emergency orders concerning infant Daughter and three-year-old Son. According to the supporting affidavit, Mother's urine screening tested positive for marijuana, Mother and Father admitted to marijuana use while Mother was pregnant with Daughter, and in 2014, Mother's three oldest children were removed after the youngest of the three was born testing positive for methamphetamine, cocaine, and marijuana. The Department also filed lab-test results that showed Daughter's meconium was positive for cocaine and marijuana. The record reflects that due to the presence of cocaine and marijuana in her system at birth, Daughter began to have "seizures and shakes."

The Department removed Son and Daughter from Mother and Father and placed them with their maternal grandparents, who had adopted Mother's three oldest children through the Department after Mother's parental rights to those children were terminated. The Department removed Son from the placement with his grandparents and placed him with a foster family after the grandparents reported that they were not able to care for him. In September 2020, the Department placed Son and Daughter together with a maternal aunt but in January 2021, that placement was disrupted after the police cited the aunt for leaving the children in a vehicle unattended while she went into a store. The Department placed the children in a non-relative foster home but on March 5, moved them to a different non-relative foster home at the prior foster mother's request because of Son's behavior.

Mother's court-ordered family service plan required that she not use any illegal or illicit drugs, not participate in criminal activities or associate with others who were involved in

2

illegal activities, submit to drug testing on a weekly basis, submit to a drug and alcohol assessment and follow all recommendations, participate in individual counseling, and complete a psychological evaluation and follow all recommendations. During the pendency of the case, Mother participated in services, submitted to drug testing, completed outpatient treatment in October 2020, submitted to a psychological evaluation in December 2020, and visited with her children. At the beginning of February 2021, the Department authorized unsupervised visits and planned to return the children to Mother and Father on a monitored return. Mother and Father had one unsupervised visit with the children, but the Department's plans for the children changed after Mother and Father both tested positive for cocaine on February 8 and March 30. The Department discontinued unsupervised visits, and after a negative diluted test result on April 8—under Mother's family service plan, diluted test results were considered positive—Mother started inpatient treatment on April 12.

The bench trial occurred on May 18 and 25. On the first day, Mother participated in trial from the inpatient treatment facility, but she was out of the facility and with Father on the second day.[2] The witnesses were the conservatorship caseworker, Mother, Father, and the guardian ad litem. The evidence showed that during the pendency of the case, Mother and Father remained in a relationship, lived together, were employed, had appropriate housing, visited with their children, and continued to participate in court-ordered services, including mostly testing negative on their weekly drug tests. In addition to the two positive tests for cocaine in February and March 2021 and the diluted test result in April 2021, Mother tested

---

[2] The trial was held via video conference due to COVID-19 restrictions. *See* Supreme Court of Texas's Second Emergency Order Regarding the COVID-19 State of Disaster (Misc. Docket No. 20-9043) and all subsequent Orders. The record reflects that Mother and Father were sharing the same device on the second day of trial.

positive for marijuana three times in June and July 2020, and Father tested positive for marijuana seven times in June and July 2020.

The caseworker testified about Mother's relinquishment of her parental rights to her three oldest children after the Department became involved in 2014 because of Mother's drug use, the Department's involvement with the family in this case because of Mother's and Father's drug use when Mother was pregnant with Daughter, and the parents' actions during the pendency of the case. The caseworker testified that, when she viewed interactions among Mother and Son and Daughter, they seemed attached and bonded and that the Department's plan was for a monitored return, which changed when Mother and Father tested positive for cocaine on February 8 and March 30. Concerning the children's placements during the case, the caseworker testified that after the placement with the aunt was disrupted, they were placed together in a foster home but moved to the current foster home because the prior foster mother "could not handle [Son's] behavior and the Department did not want to split [the children] up." The caseworker testified that the children were "thriving" and doing "well overall" in their current placement, that Son had "come a long way" although they were still "having problems with his behavior," and that the foster parents were "definitely trying to work with him in regards to, you know, his behaviors," "giving him that structure, home environment that he needs," and taking him to therapy. The caseworker testified that Father also "had mentioned that he felt like the kids were thriving in the current home that they're in." The evidence showed that the foster parents were not a legal risk foster home but that they had not ruled out becoming one and adopting the children.[3]

---

[3] In its brief, the Department states that a legal risk foster home is "a foster home that wishes to adopt the child but understands that the case has not entered the adoptive phase yet

Mother testified that she relinquished her rights to her three oldest children after one of the children tested positive for methamphetamine, cocaine, and marijuana when the child was born in 2014 but that she continues to have daily contact with those children, including helping them with their school work and "never miss[ing] a birthday or a holiday." Mother stated that she completed a 60-day treatment program in that case but losing her three oldest children did not get her attention because of her mental illness and her realizing that she had other mental illnesses "that nobody told [her]" about as well. Mother testified that she recently went to My Health My Resources (MHMR), where she was diagnosed with Bipolar 1 and that she had an upcoming appointment concerning "medicine" with "a licensed therapist to help [her] understand everything about Bipolar 1." She further testified that no one told her that she "had to go to rehab" but she nevertheless chose to do so. Although she completed outpatient treatment in October 2020, she testified that she "actually got help" and "realistic tools" in the most recent inpatient treatment. She testified that she just finished that treatment and now understood that she would always be an addict but that she had a "better support system" and "can get better." She explained that this case is different from the last one because she is older and understands that she needs to accept responsibility for her actions. She asked the trial court for more time so that she could continue to show sobriety.

Mother's psychological evaluation was admitted as an exhibit. The psychologist diagnosed Mother with major depressive disorder, generalized anxiety disorder, borderline personality disorder, cocaine use disorder, hallucinogen use disorder, and cannabis use disorder

---

and, therefore, there is a legal risk that the placement may not be long-term." *See In re M.L.R-U., Jr.*, 517 S.W.3d 228, 234 n.11 (Tex. App.—Texarkana 2017, no pet.) ("A 'legal risk home' is one where the placement family is motivated to adopt the children, but [is] aware the children might be returned to the parent.").

and stated that Mother reported having been previously diagnosed with major depression, anxiety disorder, and borderline personality disorder. From the testing results, the psychologist concluded that Mother did not recognize the seriousness of her issues, that she was unlikely to consistently take account of the needs and feelings of others, and that she appeared to be "a questionable parental resource." Mother testified that the psychological evaluation was not explained to her and that she did not timely receive it:

> And then the psych evaluation I got in this case was never given to me until right before the case, so I had no chance to work on it. And they had it before I relapsed. It's a chemical imbalance that messes with you. It's a disease that I have to fight, along with other mental illnesses that I just realized that I had because nobody told me or gave me the paper so I could figure out myself how to get help.

She later admitted that her counselor had a copy of the evaluation but testified that the counselor only told her about the psychologist's concerns, not "anything on the diagnosis part." The caseworker testified that she provided a copy of the evaluation to Mother's counselor on the day that the caseworker received it in January 2021, but Mother testified that she and her counselor "never really discussed it," that her counselor "never got a chance to explain it," and that Mother never got an answer to whether she could have a copy of it.

In his testimony, Father admitted to using cocaine "very few" times and marijuana on a regular basis. Father completed a Parenting Awareness Drug Risk Education (P.A.D.R.E.) program in October 2020, but he described it as "like a five-minute class" that was not "about drugs" or "addiction." He also testified that he "chose to partake in the cocaine use" during the pendency of the case knowing "what's at stake," that he "might have a problem" and "need[ed] to get help because of the consequences not sinking in," and that he had "just started" outpatient treatment—he was "going to be set[ting] up [his] first appointment"—but did not

6

know when he would start because they had not called him back. He testified that when he and Mother tested positive for cocaine, they had had one unsupervised visit with their children and that although he did not know that the monitored return was close to happening, they "didn't do [themselves] any favors." He characterized their cocaine use during the pendency of the case as a "slipup" and agreed it was a "really bad decision." Father testified that they were "great" people and parents who wanted their children back and agreed that he was asking the court "for some additional time to maybe prove" that they "were worthy" of a monitored return.

In her testimony, the guardian ad litem agreed that the children were thriving in their current placement, testified that her recommendation aligned with the Department's, and opined that termination was in the children's best interest "so that the children can be placed in a legal risk foster home." She was also the guardian ad litem in the prior case concerning Mother's three oldest children, described this case as "almost a carbon copy" of that one, and testified that "we can't leave the children in danger or in limbo while we hope the parents are able to maintain their sobriety." She testified that she would "constantly have concerns" if the parents were given more time because Father "literally admitted" that "they used drugs and hoped they did it in a timeframe that they wouldn't get caught, so that sent the red flag up for [her]." Specifically, Father answered, "Yeah," when asked, "I'm assuming your hope was that you could do [cocaine] and that it could go undetected. Is that fair to say?" The guardian ad litem also referenced that this case was her "second go-around" with Mother and that she "[felt] like the parents' failure to comply, using drugs during the act—pendency of this case shows that they're not able to be safe or appropriate caregivers for these children now or in the future."

Following the bench trial, the trial court signed the final decree of termination. The trial court found by clear and convincing evidence that statutory grounds existed for

termination of the parent-child relationship between Mother and the children, *see* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), (P), and that termination of Mother's parental rights was in the children's best interest, *see id.* § 161.001(b)(2). This appeal followed.

## ANALYSIS

In her sole issue, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding that it was in the children's best interest for her parental rights to be terminated.

*Standard of Review*

To terminate parental rights under section 161.001, the Department has the burden to prove one of the predicate grounds in subsection (b)(1) and that termination is in the best interest of the child. *See id.* § 161.001(b)(1), (2); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). The applicable standard of proof is clear and convincing evidence. Tex. Fam. Code § 161.206(a); *see In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002) (explaining that "[d]ue process requires the application of the clear and convincing evidence standard of proof in parental termination cases"). The clear and convincing evidence standard is "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002) (quoting *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)); *see* Tex. Fam. Code § 101.007 (defining "clear and convincing evidence"). Although "parental rights are of constitutional magnitude," "it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d at 26.

Legal sufficiency review of the evidence to support a termination finding requires a court to look at all the evidence in the light most favorable to the finding and consider undisputed contrary evidence to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id.* at 631. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

In our review of the evidence, we must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (citing *In re J.L.*, 163 S.W.3d 79, 86–87 (Tex. 2005)); *see In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (explaining that appellate court "should not supplant the [factfinder's] judgment with its own"); *see also In re J.J.O.*, 131 S.W.3d 618, 632 (Tex. App.—Fort Worth 2004, no pet.) (explaining that in bench trial, trial court judges credibility of witnesses and determines weight to be accorded their testimony).

*Best-Interest Finding*

"The best-interest inquiry is a forward-looking determination that asks whether termination serves the best interest of the child in the future." *In re R.L.*, No. 04-13-00226-CV, 2013 Tex. App. LEXIS 12279, at *17 (Tex. App.—San Antonio Oct. 2, 2013, no pet.) (mem. op.). "[T]here is a strong presumption that the best interest of a child is served by keeping the

child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). "And because of the strong presumption in favor of maintaining the parent-child relationship and the due process implications of terminating a parent's rights to her minor child without clear and convincing evidence, 'the best interest standard does not permit termination merely because a child might be better off living elsewhere.'" *In re D.L.W.W.*, 617 S.W.3d 64, 81 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (quoting *In re J.G.S.*, 574 S.W.3d 101, 121–22 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (internal quotations omitted)).

Relevant factors in assessing the best interest of a child include: (i) the desires of the child, (ii) the stability of the home or proposed placement, (iii) parental abilities, (iv) the emotional and physical needs of the child now and in the future, (v) the emotional and physical danger to the child now and in the future, (vi) the plans for the child by the individual or agency seeking custody, (vii) the programs available to assist the individuals seeking custody to promote the best interest of the child, (viii) acts or omissions by the parent showing that the parent-child relationship was not proper, and (ix) any excuses for the parent's conduct. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also* Tex. Fam. Code § 263.307 (stating that "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest" and listing factors that court should consider "in determining whether the child's parents are willing and able to provide the child with a safe environment"). No one factor is controlling, evidence on each factor is not required, and evidence presented to satisfy the predicate-ground finding may also be probative of the child's best interest. *See In re C.H.*, 89 S.W.3d at 27–28; *Pruitt v. Texas Dep't of Fam. & Protective Servs.*, No. 03-10-00089-CV, 2010 Tex. App. LEXIS 10272, at *22–23 (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.).

10

As support for her challenge to the trial court's best-interest finding, Mother relies on her testimony that she had learned "realistic tools" in her most recent inpatient treatment, that she now "has a good support system," that this case is different from the last one because she is older and understands that she needs to accept responsibility for her actions, and that she continues to have daily contact with her three oldest children. Mother also relies on the guardian ad litem's testimony that the guardian ad litem could not remember the last time she saw the children and on the lack of "any witness with personal knowledge of the current well-being of the children." There also was evidence that Mother had been employed throughout the case and had appropriate housing and that the children were bonded and attached to her.

It was for the trial court as the factfinder to weigh the conflicting evidence and resolve and assess the credibility of the witnesses. *See In re A.B.*, 437 S.W.3d at 503 (explaining that appellate court defers to decisions of "factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses"). Given the evidence of Mother's past endangering conduct and improbable testimony,[4] the trial court reasonably could have found Mother not credible and disbelieved her testimony that she would remain drug free if her children were returned to her. *See In re S.B.*, No. 07-19-00146-CV, 2019 Tex. App. LEXIS 9695, at *29 (Tex. App.—Amarillo Nov. 5, 2019, pet. denied) (mem. op.) (observing that "as the trier of fact, the trial court resolved credibility issues and conflicts in the evidence against [parent]").

_____

[4] For example, in assessing Mother's credibility, the trial court could have considered Mother's testimony that no one told her about her diagnosed mental illnesses. The caseworker testified that she provided a copy of the psychological evaluation to Mother's counselor on the day that the caseworker received it in January 2021, but Mother testified that she and her counselor "never really discussed it," that her counselor "never got a chance to explain it," and that Mother never got an answer to whether she could have a copy of the evaluation.

The trial court reasonably could have inferred from the evidence that Mother's past drug use, including when she was pregnant and during the pendency of the case within a few months of trial, would recur in the future if the children were returned to her and that she would be unable to provide the children with a safe and stable home environment. *See S.C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00039-CV, 2020 Tex. App. LEXIS 5115, at *50 (Tex. App.—Austin July 10, 2020, no pet.) (mem. op.) (explaining that illegal drug use supports finding that termination is in child's best interest and that "factfinder may give great weight to this significant factor"); *In re A.A.H.*, Nos. 01-19-00612-CV & 01-19-00748-CV, 2020 Tex. App. LEXIS 1915, *37 (Tex. App.—Houston [1st Dist.] Mar. 5, 2020, pet. denied) (mem. op.) (explaining that "parent's past conduct is probative of his future conduct when evaluating the child's best interest" and that "factfinder may also infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent when assessing the best interest of the child"); *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 705–06 (Tex. App.—Austin 2019, pet. denied) (noting that "factfinder is entitled to give 'great weight' to a parent's drug-related conduct, as it is considered a 'significant factor' supporting termination"; that even if parent "might have stopped using methamphetamine later in the case," factfinder "could have reasonably inferred that the [parent's] past conduct could recur in the future if the child were to be returned"; and that factfinder also could have reasonably inferred that recent positive changes were "too late in the case to demonstrate that [the parent] could provide the child with the long-term safety and stability that the child would need over the course of her childhood"); *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (stating that "factfinder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent").

Despite Mother completing drug treatment programs in the 2014 case and outpatient treatment in October 2020 and Father completing the P.A.D.R.E. program in October 2020, Mother and Father used cocaine together in February 2021, a few days after an unsupervised visit with their children, and then in March 2021, a few months before trial. *See In re F.A.R.*, No. 11-04-00014-CV, 2005 Tex. App. LEXIS 234, at *11 (Tex. App.—Eastland Jan. 13, 2005, no pet.) (mem. op.) (noting that "continued drug use—even after undergoing two drug treatment programs—demonstrates an inability to provide a stable environment for [the child] and an inability to provide for his emotional and physical needs"); *see also Wischer v. Texas Dep't of Fam. & Protective Servs.*, No. 03-12-00165-CV, 2012 Tex. App. LEXIS 7523, at *36 (Tex. App.—Austin Aug. 29, 2012, no pet.) (mem. op.) (explaining that reasonable factfinder could have concluded that parent "showing poor judgment currently and in the past" demonstrated inability to provide adequate care for child and that parent would not be able to provide children with permanency or stability given outcome of prior opportunities for reunification and repeated patterns of poor judgment).

The trial court also could have found that the evidence of the parties' plans for the children and the children's current placement weighed in favor of termination. *See Holley*, 544 S.W.2d at 371–72 (including parties' plans for children and stability of placement among factors in best-interest determination). Mother contends that "there was no testimony from any witness with personal knowledge of the current well-being of the children," but the caseworker and guardian ad litem testified based on personal knowledge. For example, the caseworker testified that she spoke with the foster parents the day before trial, that she receives pictures from them, and that she has visited with the children, and although the guardian ad litem did not know the last time she visited with the children "off the top of [her] head," she testified that she visited

13

with the children "prior to court." As the factfinder, the trial court could have found the caseworker's and guardian ad litem's testimony credible that the children were "thriving" and being well taken care of in their current placement. And although the Department may have to find a different home to adopt the children, the current foster family had not ruled out the possibility of adopting the children. *See In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013) (explaining that Department's goal for child was "unrelated adoption, although there was no evidence that his foster family would, or would not, adopt him" and that Department's lack of definitive plan for permanent placement or adoption could not be "dispositive factor" (quoting *In re C.H.*, 89 S.W.3d at 28)).

In contrast to the evidence about the children's current placement, the trial court, as the factfinder, reasonably could have inferred from the evidence, including Mother's psychological evaluation, that Mother was not ready to provide a safe and stable home for the children if they were returned to her or that she would not be able to maintain one.[5] *See In re A.B.*, 437 S.W.3d at 503; *Holley*, 544 S.W.2d at 371–72 (listing parental abilities and stability of home among factors to consider in best-interest determination). In addition to diagnosing Mother with mental illnesses, the psychologist in his evaluation stated that Mother appeared to be "a questionable parental resource," that she did not recognize the seriousness of her issues, and that she was unlikely to consistently account for the needs and feelings of others. Further, at the time of trial, the children were of vulnerable ages, and Mother chose to remain in a relationship and live with Father, who testified that he "might have a problem" and "need[ed] to get help because of the consequences not sinking in" and that he was starting outpatient

---

[5] The caseworker testified that during their testimony at trial, Mother's speech pattern was very rapid and that Father appeared to be lethargic and slurring his words and that the parents had spoken that way in the past.

treatment but did not know when. And although Mother testified that she had an appointment to address her diagnosis of Bipolar 1, she admitted that this illness remained untreated. Moreover, Mother and Father did not testify that they were ready for the children to be immediately returned to their care but sought for the trial court to delay its decision and to give them more time to show sobriety.

As to the evidence that the children were bonded and attached to Mother, the trial court reasonably could have found this evidence not a significant factor, particularly given the evidence supporting its unchallenged predicate-grounds findings. *See In re C.H.*, 89 S.W.3d at 27–28 (stating that evidence presented to satisfy predicate-ground finding may also be probative of child's best interest and that "absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child"); *see also T.M. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00174-CV, 2021 Tex. App. LEXIS 8226, at *33 (Tex. App.—Austin Oct. 8, 2021, no pet. h.) (mem. op.) (explaining that there was no evidence that children were mature enough to express wishes or that wishes should be given significant weight). The trial court found, and Mother does not challenge, that she knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the children's well-being, *see* Tex. Fam. Code § 161.001(b)(1)(D); that she engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the children's physical or emotional well-being, *see id.* § 161.001(b)(1)(E); that she failed to comply with the court-ordered services, *see id.* § 161.001(b)(1)(O); *In re E.C.R.*, 402 S.W.3d at 249 (observing that parent's failure to complete court-ordered services can support best-interest finding); and

15

that she used a controlled substance in a manner that endangered the health or safety of a child and continued to abuse a controlled substance after completion of a court-ordered substance abuse treatment program, *see* Tex. Fam. Code § 161.001(b)(1)(P). In particular, the trial court could have given significant weight to the evidence that Mother's endangering conduct of using drugs while pregnant with Daughter was repeat conduct from the 2014 case.

Mother contends that the facts in this case are analogous to facts that this Court found to be factually insufficient to support a trial court's best-interest finding. *See Horvatich v. Texas Dep't of Protective & Regulatory Servs.*, 78 S.W.3d 594, 596 (Tex. App.—Austin 2002, no pet.). But the facts in *Horvatich* are distinguishable. In that case, the Department was unable to call the children's current caseworker as a witness because it had failed to designate her and, therefore, was unable to provide

> any testimony regarding the condition of the children for at least ten months preceding trial, how they were doing in foster care, whether they were being considered for adoption, the Department's plan for the children, including whether the Department would attempt to place the three siblings together, or why the Department had decided against placement with the children's maternal grandmother.

*Id.* at 599. In contrast, the current caseworker and the guardian ad litem in this case provided testimony about the children's current and prior placements, including how the children were doing, and the Department's plan to place the children in the same home for adoption. Although the children had been in multiple placements during the pendency of the case, the evidence showed that the main reasons for the multiple placements were the Department's attempts to place the children with relatives and its goal to keep the children together. The Department placed the children with their maternal grandparents and later with their maternal aunt, but those placements were disrupted by the placements' choice or improper conduct.

16

Viewing the evidence under the legal sufficiency standard of review, we conclude that the trial court could have formed a firm belief or conviction that terminating Mother's parental rights was in the children's best interest. *See* Tex. Fam. Code § 161.001(b)(2); *In re A.C.*, 560 S.W.3d at 630–31. Further, viewing the evidence under the factual sufficiency standard of review, we conclude that the evidence is such that the trial court reasonably could have formed a firm belief or conviction that termination of Mother's parental rights was in the children's best interest. *See In re A.C.*, 560 S.W.3d at 631. Thus, we conclude that the evidence was legally and factually sufficient to support the trial court's best-interest finding.

## CONCLUSION

For these reasons, we affirm the trial court's final decree of termination.

_____

Melissa Goodwin, Justice

Before Justices Goodwin, Baker, and Smith
  Concurring and Dissenting Opinion by Justice Smith

Affirmed

Filed:  December 15, 2021