IN the INTEREST OF M.L.R-U., JR.,
M.U-T., Jr., and G.L.C.U.,
Children

No. 06-16-00088-CV

Court of Appeals of Texas,
Texarkana.

Date Submitted: March 7, 2017

Date Decided: March 23, 2017

18. *Id.* at 394–95.

Mark T. Zuniga, Office of General Counsel, Austin, TX, for Appellee.

Leah Curtis, Greenville, Civil–Ad Litem for M.L.R-U., Jr., M.U-T., Jr., G.L.C.U., Children.

Charles E. Perry, Attorney at Law, Commerce, TX, for Appellant.

Before Morriss, C.J., Moseley and Burgess, JJ.

## OPINION

Opinion by Justice Burgess

In a suit brought by the Texas Department of Family and Protective Services (the Department), the trial court terminated Sadie's parental rights to her three children, M.R., M.T., and G.U.[1] In her sole point of error, Sadie argues that there was insufficient evidence to support the trial court's termination order. For the reasons below, we affirm the trial court's judgment.

## I. Sufficient Evidence Exists to Support Termination of Sadie's Parental Rights.

### A. The Evidence

On January 24, 2015, Russell Thompson, a night response worker for the Department, was dispatched to the home of the children's aunt for an investigation on a complaint of neglectful supervision.[2] Thompson testified that when he arrived at the residence, Sadie informed him that she and her three children resided in the home, along with two other adults and three other children, all of whom were family members. Thompson described the residence as a "substandard," "wood-framed[,] storage[-]shed building." Thompson immediately noticed that there was no electricity in the residence and that the inside of the house was very cold. Sadie informed Thompson that the residence had been without electricity for two weeks.

When Thompson entered the kitchen area, he noticed that there was no refrigerator. He was told, however, that the refrigerator was located on the porch. Thompson testified that there was no food in the kitchen, but that he observed food for the family dog. Sadie explained to Thompson that there had been no food in the home for an indefinite period of time. Thompson observed a love seat in the living area, but noted that there were no beds in the home. Sadie informed Thomp-

---

1. In order to protect the children's privacy, we will refer to the appellant by the pseudonym Sadie, and to the children by the initials M.R., M.T., and G.U. *See* Tex. R. App. P. 9.8. At the time of trial, the alleged fathers' paternal rights were also terminated. They did not appeal the trial court's orders of termination.

2. Thompson testified that his sole purpose in visiting the home was to "make sure the kids [were] safe when [he] walk[ed] out the door."

son that the children slept in a "pack-and-play." Thompson stated that the front yard was "bare dirt" and "looked like it was more of a parking area." Sadie informed Thompson that she did not work and that she was not receiving child support from any of the children's fathers.

Thompson testified that Sadie was uncooperative and that "it was like pulling teeth to get any kind of answer out of her at all." He stated that the adults in the residence were "very resistive," but that he "get[s] that a lot and that's neither here nor there." Thompson was unable to move the children to a more appropriate place because Sadie and another adult on the premises removed the children while Thompson was speaking to the children's aunt.

Carla Delagado, a Department investigator, testified that she also visited the residence in January. When she arrived at the home, three adults were present, but the children were not in the home. Delagado stated, "There was no utilities. There was, really, nothing working. No heater, no beds. There was only a couch in the living room." Based on what she observed, Delagado testified that the residence was an inappropriate place for children. Sadie informed Delagado that the children had been staying with her brother, Daniel, since the initial report had been made. Upon learning of the children's whereabouts, Delagado proceeded with a parental child-safety placement, which meant she would be formally placing the children with the brother [3] in order to allow Sadie "to be working some services."

Delagado stated that around February 4, Daniel sent a text message to her in-

forming her that he was in the process of placing the children back with Sadie because the utilities at the home were working and because there was adequate food for the children. Upon receiving his message, Delagado went back to the home in which Sadie had been residing in order to verify Daniel's representations. When Delagado arrived, she found that the utilities were working, there was a playpen for the youngest child, and "a place for the older kids. They had one bed, which both of them could fit in that same bed." Delagado also noted that there was food in the home for the children. Sadie informed Delagado that her mother and father had provided her with money to pay for the food and utilities. At that time, Delagado was advised to leave the children in the home and to request a family-team meeting since Sadie's mother and father were now involved in the situation.

Shortly after Delagado's visit, the parties appeared for the family-team meeting, and a "safety plan" was created for Sadie and the children. Sadie's mother agreed to pay the necessary bills, and Sadie agreed to search for employment. Based on the home visits, the Department deemed the allegation of physical neglect to be "valid"; however, because of assurances made at the family-team meeting, the case was closed.

On October 22, 2015, Tabetha Sims, an investigator for the Department, was dispatched to the residence where Sadie and the children were residing.[4] Upon entry into the residence, Sims observed a single light on in the kitchen, but noticed that none of the other lights were working. Sims later determined that the working light was attached to an extension cord

---

3. Delagado testified that she had been to Sadie's brother's home and that it was an appropriate placement for the children.

4. The intake complaint was for neglectful supervision of the children, that is, "eight children resided in the residence with no food, no electricity, and no water."

that led outside of the house. Sims observed an odor in the home, and when she lifted the lid of the toilet, she "observed an abundance of feces and urine." Sims also found that there was no running water available in the residence. Sims stated that this type of living environment could be a hazard to young children.[5] Sims observed opened cans on the kitchen counter, which contained "jagged edges all the way around." Sims testified that there was only one twin bed in the entire home and that thirteen people were currently living there. Sadie informed Sims that she and her three children slept in the twin bed.

Sims stated that all of the occupants, including Sadie, acted in a "[h]ostile" manner toward her. Sims asked Sadie to provide her name and date of birth, but she refused to do so. Sims testified that other than cursing and screaming at her, Sadie refused to talk to her; however, Sadie did eventually provide the children's names and dates of birth. Based on what she had observed and after speaking to her supervisor and the program director, Sims proceeded with an emergency removal notice, which allowed the Department to take temporary custody of the children.

When Sims attempted to issue the removal notice, Sadie left with one of the children, but law enforcement officers quickly convinced her to return to the property. When she returned, Sadie was belligerent, combative, and refused to sign

any paperwork, but she agreed to come to the Department with the children. Sims testified that Sadie and the other adults in the home were referring to Sims as "a dyke and a lesbian" and that they informed the children that Sims "was going to rape them and molest them and possibly kill them."[6] On cross-examination, Sims testified that when she visited Sadie's residence, the children were not in need of medical care. Sims agreed that there had been food in the kitchen cabinets at the time of her visit.[7] Sims also stated that she did not believe the children were malnourished to the point of requiring the care of a physician.

Christina Arbogast, a caseworker for the Department, was assigned to Sadie's case on March 18, 2016. When Arbogast initially received Sadie's case, she questioned whether her parental rights should be terminated. Arbogast stated,

[Sadie] had worked through her services.[8] By the time I got the case in March, she had completed her psychologic evaluation. She had completed two parenting classes. She had tested negative on three—two separate occasions, three drug tests. She had been going to counseling and actually was discharged at the point with a recommendation that she be reunified with her children. She had been coming to visits—I think there

---

5. At the time, the children's ages ranged from one year to five years old.

6. During the process of removing the children, Sadie informed Sims that her brother, Daniel, might be a suitable placement for the children. Sims contacted Daniel, but he was unwilling to take the children into his home. Sadie also suggested that her mother might be a potential placement for the children. It was determined, however, that Sadie's mother was not a feasible alternative because she had a previous history with the Department.

7. Photographs of the kitchen showed two cans of salmon, multiple cans of pinto beans, tomato sauce, and several loaves of bread.

8. In November 2015, the trial court issued a temporary order following adversary hearing and ordered Sadie to submit to a psychological or psychiatric evaluation by a court-ordered therapist; attend, participate and successfully complete parenting classes; and comply with each requirement set out in the Department's service plan.

were only two that was relayed to me that she had missed at that point.

Arbogast testified that she believed Sadie needed "to stand on her own two ... feet as far as housing goes." Arbogast stressed to Sadie that she needed to change the conditions in which the children were living and that she needed to find employment. Arbogast stated, "Initially she was receptive and understood it—or at least I thought she did." Sadie eventually found a job with a grain company, but lost her job shortly after she acquired it.[9] Despite reiterating to Sadie that she needed to find employment to regain custody of her children, Sadie failed to do so. At the time of trial, Sadie remained unemployed.

Arbogast also voiced her concerns over Sadie's behavior during visits with the children.

> I actually had to go in and intervene and let her know that she needed to put the cell phone away because previously we had gone over visitation rules and one of the big rules that we have is that no cell phones are allowed to be used in the visitation room because that's a time with your children.

Arbogast testified that after she asked Sadie to discontinue her cell phone use, "She was a little frustrated[,] but she did put the cell phone away."

Arbogast stated that Sadie was "a little slow to comprehend some of the things [they] were explaining to her" and that her behavior was a concern. Arbogast explained to Sadie that she should participate in a mental-health evaluation because she thought Sadie might be eligible for Social Security benefits based on the results of the evaluation. Sadie responded by informing Arbogast that she was fully capable of working and that she had no need for Social Security benefits.

After working with Sadie for a period of time, Arbogast began to believe that the Department should work toward the goal of terminating Sadie's parental rights, rather than focusing on improving her parenting skills. Arbogast's change of opinion was based, in part, on Sadie's involvement with the process. For instance, Arbogast had finally convinced Sadie to submit to a mental-health evaluation, but Sadie's mother intervened and sent a message to Arbogast informing Arbogast that she did "not need to be telling her daughter that she needs to go to MHMR" to participate in an evaluation. Regardless of Arbogast's insistence, Sadie chose not to participate in services that could have potentially assisted her in providing for her children. Arbogast stated that when Sadie was around her mother, "she was more aggressive, she was very negative in her thought process—processes. She was not receptive to what the Department was trying to do to help her, with grandma around."

As time passed, Sadie continued to have difficulty following her service plan. Although Sadie was required to maintain a suitable home, she was evicted from her residence. Arbogast explained that despite this change in her circumstances, Sadie failed to inform the Department that she was no longer living at her former residence. Several weeks passed before the Department knew of Sadie's whereabouts. At the time of the hearing, Arbogast believed Sadie was living in a motel with her family.

In addition, Arbogast testified that Sadie had been attending "trauma-informed" counseling but was unsuccessfully discharged based, in part, on Sadie's

---

9. Sadie informed Arbogast that she lost her job because "there was a mess-up on the paperwork and they put down that she showed up at the wrong time." Arbogast later determined that Sadie had lost her job for reasons other than those given by Sadie.

irritation with a counselor who had been challenging her to complete the tasks necessary to reunite with her children. In fact, Sadie's brother physically threatened the counselor, prompting the counselor to file a police report and cancel any additional sessions with Sadie. Despite that incident, the Department attempted to schedule Sadie for trauma-informed counseling a second time, but Sadie failed to follow through with the sessions.

Arbogast stated that the trial court had given Sadie an opportunity to participate in three home visits with her children. Sadie responded by canceling the first visit and chose not to attend the second visit.[10] In addition, G.U.'s birthday occurred between the first and second visits, but Sadie failed to acknowledge the day by contacting the child via a telephone call or birthday card. Arbogast opined that Sadie's failure to spend time with her oldest child, M.R., had an adverse effect on him. She testified, "He began acting out in the actual foster home, throwing things at his siblings...." At least one additional visit was missed because Sadie had been incarcerated at the time the visit was scheduled to occur. Arbogast agreed that termination was in the best interests of the children. When asked to identify Sadie in the courtroom, Arbogast was unable to do so because Sadie was not present during the trial.

Arbogast went on to explain that the children had been placed "in a legal risk home"[11] two weeks prior to the hearing. According to Arbogast, the children were doing well in the placement home. Arbogast testified, "The kids are thriving. Their needs are being met and actually exceedingly met. They like it there." Arbogast stated that M.R. wanted to be reunited with Sadie, but in Arbogast's opinion, and that was not a feasible alternative at the time.

Referring to the children's placement family, Anna Duesterberg, the children's Court-Appointed Special Advocate, stated that the children were "very happy," that they were doing well at their foster home, and that the children referred to their foster parents as "mom" and "daddy." Duesterberg opined that it was in the children's best interests to terminate Sadie's parental rights and to move forward with the placement family's desire to adopt the children. Moreover, Duesterberg had spoken to Sadie's oldest child, M.R., just prior to trial, and he indicated to her that he desired to stay with his foster family and his siblings. Duesterberg testified,

> I asked him, um, if he liked where he was and he said, yes. And I asked him where he wants to—to be and he said he wants to be at the house he's at because

---

10. After Sadie missed one of her July visits, Arbogast and another caseworker made an unannounced visit to Sadie's residence about an hour after the visit had been scheduled to occur. When they arrived, Sadie and her sister were sitting inside a vehicle, along with her sister's newborn baby. When Arbogast asked Sadie why she missed her visit with the children, she stated she had a job interview; however, when Arbogast asked Sadie to expound on the interview, Sadie refused to respond. Arbogast proceeded to go inside the residence, noticing that it was "extremely hot" in the house. It was then that Arbogast learned the house was again without electrici-

ty. Arbogast testified, "The fact that she was not able to keep the utilities on in the home where she expected to bring the children home to is problematic for the simple fact that it was in the middle of the summer and it was extremely hot outside." Despite the trial court's and the Department's efforts, Sadie visited with the children two times in a span of four months.

11. A "legal risk home" is one where the placement family is motivated to adopt the children, but are aware the children might be returned to the parent.

he has a mom and dad and that they do things with him.

When asked about Sadie's absence during the trial, Duesterberg agreed that Sadie's choice was an indication of her desire not to proceed with the case. The trial court asked Duesterberg about Sadie's failure to visit with the children and what her thoughts were on why she failed to exercise her visitation rights. Duesterberg responded, "[S]he wouldn't come out and say that she didn't want to; she just kept canceling them and didn't give us a reason why."

Anne-Marie Jordan, a Department supervisor, testified that the Department's plan was that the children be adopted by their current placement family. Jordan testified that adoption was in the best interests of the children due to Sadie's inability to care for them and the foster family's ability and willingness to do so. Jordan stated,

I believe that the current placement that they're in can meet their current needs as well as the plans for them in the future. In my opinion, [Sadie] struggles with planning for tomorrow versus what the kids might need long-term.

The kids, I believe, would be not as safe if returned to her house. And so I feel like that they could be in danger versus where they are now.

Jordan continued by stating that the foster family had the financial ability to care for the children. She also stated that the foster family was able to meet the children's educational and housing needs.

### B. Standard of Review

■ "The natural right existing between parents and their children is of constitutional dimensions." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Indeed, parents have a fundamental right to make decisions concerning "the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). "Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at trial." *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014). This Court is therefore required to "engage in an exacting review of the entire record to determine if the evidence is …. sufficient to support the termination of parental rights." *Id.* at 500. "[I]nvoluntary termination statutes are strictly construed in favor of the parent." *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied) (quoting *Holick*, 685 S.W.2d at 20).

■ In order to terminate parental rights, the trial court must find, by clear and convincing evidence, that the parent has engaged in at least one statutory ground for termination and that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2016); *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012). "Clear and convincing evidence" is that "degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014); *see In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). This standard of proof necessarily affects our review of the evidence.

■ In our legal sufficiency review, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder reasonably could have formed a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.). We assume the trial court, acting as fact-finder, resolved disputed

facts in favor of the finding, if a reasonable fact-finder could do so, and disregarded evidence that the fact-finder could have reasonably disbelieved or the credibility of which reasonably could be doubted. *J.P.B.*, 180 S.W.3d at 573.

In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing. *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam). We consider only that evidence the fact-finder reasonably could have found to be clear and convincing and determine "whether the evidence is such that a fact[-]finder could reasonably form a firm belief or conviction about the truth of the ... allegations." *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)); *In re J.F.C.*, 96 S.W.3d 256, 264, 266 (Tex. 2002). "If, in light of the entire record, the disputed evidence that a reasonable fact[-]finder could not have credited in favor of the finding is so significant that a fact[-]finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *J.F.C.*, 96 S.W.3d at 266. "[I]n making this determination," we must undertake "an exacting review of the entire record with a healthy regard for the constitutional interests at stake." *A.B.*, 437 S.W.3d at 503 (quoting *C.H.*, 89 S.W.3d at 26).

Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, "the rights of natural parents are not absolute; protection of the child is paramount." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994)); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights." *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.) (citing *C.H.*, 89 S.W.3d at 26).

## C. Analysis

In terminating Sadie's parental rights, the trial court found that there was clear and convincing evidence that termination of her parental rights was in the children's best interests and that there was clear and convincing evidence that Sadie's parental rights should be terminated pursuant to Section 161.001(b)(1), grounds (D), (E), (N), and (O) of the Texas Family Code.[12]

---

12. The trial court found by clear and convincing evidence that Sadie:

 6.2.1. knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children, pursuant to § 161.001(b)(1)(D), Texas Family Code;

 6.2.2. engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children, pursuant to § 161.001(b)(1)(E), Texas Family Code;

 6.2.3. constructively abandoned the children who have been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than six months and: (1) the Department has made reasonable efforts to return the children to [Sadie]; (2) [Sadie] has not regularly visited or maintained significant contact with the children; and (3) [Sadie] has demonstrated an inability to provide the children with a safe environment, pursuant to § 161.001(b)(1)(N), Texas Family Code;

 6.2.4 failed to comply with the provisions of a court order that specifically established the actions necessary for [Sadie] to obtain the return of the children who have been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the children's removal from the

Without citing a specific provision, Sadie contends that the Department failed to present sufficient evidence to prove the existence of a statutory ground for termination or that it was in the children's best interest to terminate her parental rights. We disagree.

### 1. Statutory Grounds for Termination

When multiple predicate grounds are found by the trial court to support termination, an appellate court will affirm based on any one ground because only one is necessary for the termination of parental rights. *A.V.*, 113 S.W.3d at 361. Here, the trial court found, among other grounds, that Sadie failed to comply with the provisions of a court order, that is, her service plan. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O).

Pursuant to the Department's service plan for Sadie, she was required to (1) learn to manage her income to meet the family's needs; (2) gain understanding of how the family history of maltreatment has influenced the current situation; (3) remain in housing that is free of hazards and provide protection, food, and shelter for the family; (4) demonstrate an understanding of how her history may affect the children's care; (5) demonstrate the ability to use willing friends or family and resources to obtain support; (6) understand the serious nature of the situation that placed the children in harm; (7) demonstrate the ability to provide a safe, stable, and nurturing environment for the children; (8) submit to random drug tests; (9) obtain and maintain legitimate employment; (10) initiate and successfully complete parenting classes; (11) maintain face-to-face contact with the Department; and

(12) participate in weekly supervised visitation with the children.

As to many of these requirements, Sadie was unsuccessful in her efforts. The Department gave her multiple chances to find and maintain safe and adequate housing. Regardless, Sadie persisted in living in a home where the number of occupants exceeded the allotted space. The home was oftentimes without water or electricity and contained unsanitary and hazardous conditions. In addition, Sadie failed to find and maintain suitable employment, and when encouraged to seek financial assistance through Social Security benefits, she adamantly refused. Likewise, Sadie chose to surround herself with family who failed to encourage her to regain custody of her children or, at the very least, prompted her to act in a manner that was antagonistic toward the Department staff and its goals for Sadie and the children. When Sadie was surrounded by family, she acted belligerent and adversarial toward the staff, even going as far as informing her children that members of the staff would kill them. Sadie was also given at least two opportunities to attend trauma counseling. The first opportunity ending in an alleged physical threat by a family member toward the counselor, and the second opportunity was completely ignored by Sadie. In addition, when Sadie had an opportunity to visit with her children, she paid more attention to her cell phone than she did her children in some instances, and in others, she failed to even make an appearance for the scheduled visitation.

We find this evidence both legally and factually sufficient to support termination under ground (O).[13]

parent under Chapter 262 for the abuse or neglect of the children, pursuant to § 161.00[1](b)(1)(O), Texas Family Code[.]

*See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (N), (O), (2).

## 2. The Best Interests of the Children

 Sadie also challenges the sufficiency of the evidence to support the trial court's finding that it was in the children's best interests to terminate her parental rights. There is a strong presumption that keeping a child with his parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). A number of factors may be considered in determining the best interest of the child, including

> (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

*In re K.S.*, 420 S.W.3d 852, 855 (Tex. App.—Texarkana 2014, no pet.) (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). This list is not exclusive, and there is no requirement that any unique set of factors be proven. *Id.* Certainly, it is not necessary to prove all nine factors. *C.H.*, 89 S.W.3d at 27. The analysis of undisputed evidence relating to one factor may be adequate in a particular situation to support a finding that termination is in the best interest of the child. *A.V.*, 113 S.W.3d at 355. Additionally, evidence that supports one or more of the statutory grounds for termination may constitute evidence demonstrating that termination is in the child's best interest. *C.H.*, 89 S.W.3d at 28.

The children's ages ranged from one year to five years old. There exists no testimony regarding the desires of the two youngest children. Initially, the oldest child, M.R., stated he preferred to return to Sadie; however, his preference changed just days before the hearing, when he informed his guardian ad litem that he would prefer to live with his foster parents because they "[did] things with him." In addition, all three children referred to their foster parents as "mom" and "daddy," indicating the existence of a familial bond between the children and the foster parents. Further, there was evidence that the foster family provided a safe and healthy environment for the three children and that the foster family desired to make the children a permanent part of their family through the adoption process.

Sadie has a history of being unable to properly care for the children's emotional, physical, and financial needs. To make matters worse, Sadie appears to have little, if any, positive support in caring for the children either by way of the children's biological fathers or a close family member or friend. While living with Sadie and several of her family members, the children were subjected to an extremely inadequate living environment, with too few beds, no electricity, and no running water. Despite the perilous conditions in which the children were forced to live, Sadie failed to change her circumstances in an effort to improve the children's lives. Although she was successful in finding employment, her employment was very short lived and ended under dubious circumstances. Moreover, when it was suggested that Sadie

---

13. Many of Sadie's actions are applicable not only to ground (O), they also fall under the unacceptable behaviors designated under the remaining three subsections upon which the trial court based its findings.

seek government assistance as to her finances, she refused to do so. Although Sadie did complete some portions of her service plan during the initial stages, it is apparent that any long-term success in these endeavors is very unlikely. Thus, if the children were returned to Sadie's care, they would again be facing emotional, physical, and financial vulnerabilities.

In addition, Sadie repeatedly squandered scheduled visits with her three children, and her absence at the scheduled visitations adversely affected M.R. When she did appear for visits with her children, on at least two occasions, she seemed more interested in her cell phone than spending the time she had with her children. Further evidencing her disinterest, Sadie failed to even recognize G.U.'s birthday by doing something as simple as sending a card or making a telephone call. Most importantly, however, Sadie failed to appear at the trial in this matter, and we find no excuse for her absence in the record. Taking into consideration the totality of the circumstances, Sadie was either disinterested in regaining custody of the children or was simply incapable of maintaining a safe environment and fostering a healthy relationship with her children. Most, if not all, of the *Holley* factors weigh in favor of termination of Sadie's parental rights.

Considering the *Holley* factors, and in light of all the evidence, we find the trial court reasonably could have formed a firm belief or conviction that termination of Sadie's parental rights was in the best interests of the children. Thus, we find the evidence was factually and legally sufficient to support the trial court's finding that it was in the children's best interests to terminate Sadie's parental rights. Accordingly, we overrule Sadie's final point of error.

## II. Conclusion

We affirm the trial court's judgment.