

# NUMBER 13-22-00383-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF A.C., A MINOR CHILD

### On appeal from the County Court at Law No. 5
### of Nueces County, Texas.

## MEMORANDUM OPINION

### Before Justices Benavides, Tijerina, and Peña
### Memorandum Opinion by Justice Tijerina

Appellant L.C. appeals the trial court's termination of her parental rights to her minor child, A.C. By two issues, L.C. contends that there is legally and factually insufficient evidence to support the trial court's grounds for terminating her parental rights and the trial court's finding that termination was in A.C.'s best interest. We affirm.

### I.    STANDARD OF REVIEW

Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties, and powers normally

existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see In re D.S.P.*, 210 S.W.3d 776, 778 (Tex. App.—Corpus Christi–Edinburg 2006, no pet.). Therefore, termination of the parent-child relationship must be supported by clear and convincing evidence. *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005); *In re D.S.P.*, 210 S.W.3d at 778. Before terminating the parent-child relationship, the trial court must find by clear and convincing evidence that the parent committed one of the acts prohibited by § 161.001(1)(A–T) of the Texas Family Code. TEX. FAM. CODE ANN. § 161.001(1)(A–T); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). The trial court must also find by clear and convincing evidence that termination of parental rights is in the children's best interest. TEX. FAM. CODE ANN. § 153.002.

The "clear and convincing" intermediate standard falls between the preponderance of the evidence standard of civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re C.S.*, 208 S.W.3d 77, 83 (Tex. App.—Fort Worth 2006, pet. denied); *Porter v. Tex. Dep't of Protective & Regul. Servs.*, 105 S.W.3d 52, 57 (Tex. App.—Corpus Christi–Edinburg 2003, no pet.). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM CODE ANN. § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002).

In reviewing the legal sufficiency of the evidence supporting parental termination, we must "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its

2

finding was true." *In re J.L.*, 163 S.W.3d at 85 (quoting *In re J.F.C.*, 96 S.W.3d at 266); *In re D.S.P.*, 210 S.W.3d 776, 778 (Tex. App.—Corpus Christi–Edinburg 2006, no pet.). We must assume that the trier of fact resolved disputed facts in favor of its finding if it was reasonable to do so. *In re J.L.*, 163 S.W.3d at 85 (quoting *In re J.F.C.*, 96 S.W.3d at 266).

> Under a factual sufficiency standard, we consider whether the
>
> disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient.

*In re J.F.C.*, 96 S.W.3d at 266.

## II. THE EVIDENCE

On May 23, 2021, law enforcement contacted appellee The Texas Department of Family and Protective Services (the Department) for immediate assistance with three-year-old A.C. because his mother, L.C., was arrested for possession of a controlled substance and tampering with evidence. The Department filed a petition to terminate L.C.'s parental rights to A.C. on May 24, 2021.[1]

At trial, L.C. admitted that she had a history with the Department prior to A.C. in that her other son had been removed from the Department and had been adopted a few years earlier. Evidence was presented that A.C. had been removed from L.C.'s custody on two prior occasions, once in 2018 when A.C. was only a few days old and on a second occasion in 2019, which occurred approximately four months after A.C. had been returned

---

[1] A.C.'s father is deceased.

3

to L.C. The second case remained "open" for eighteen months, and the Department dismissed the case in November 2020 after three-and-one-half months of monitored return. The third and current removal occurred in May 2021. A.C. had been in the Department's care for about forty months of his fifty-month life.

Regarding the 2018 case, Alleana Brother, a Department caseworker, testified that L.C. admitted to the Department that she used several different illegal substances during her pregnancy and did not receive much prenatal care.[2] L.C. told the Department that she was homeless, had suicidal ideation, and that domestic violence occurred between L.C. and her significant other. The trial court ordered L.C. to complete services, including substance abuse treatment, counseling, parenting classes, a psychological evaluation, and to maintain stable housing and employment. Although L.C. did not complete the parenting or substance abuse treatment services, the case was closed in January 2019 after eight months, and A.C. was returned to L.C.

Four months later, in May 2019, the Department received a report that L.C. was homeless, and she had been seen walking the streets with A.C., who had been sleeping on the streets with her. Although L.C. sought assistance from the Salvation Army, she did not want to submit to drug testing. The police were called, and L.C. was uncooperative. A.C. had a sunburn and was covered in bug bites. The Department had concerns about

_____

[2] In a sworn affidavit in support of removal, admitted into evidence without objection, a Department caseworker, documented that "On May 2, 2018 a report was called in stating that L.C. had given birth to [A.C.] who is in the Neonatal Intensive Care Unit at Bay Area Hospital with respiratory issues," and she "admitted to using crack, heroin, ecstasy and cocaine in October." According to the affidavit, L.C. "tested positive for ecstasy in January and had minimal prenatal care." According to documents admitted into evidence, the Department removed A.C. from L.C.'s care "because [she] admitted to using illegal mind-altering substances while pregnant and her history of untreated mental health issues that could place [A.C.] in substantial risk of harm."

4

L.C.'s mental health and substance abuse, and the Department removed A.C. once more. L.C. was ordered to complete services as follows: a psychological examination, drug and alcohol assessment, substance abuse classes, individual counseling, and random drug testing.

Brother testified that during the second removal of A.C., L.C. was "MIA" and homeless for much of the services period. She explained that the Department was unable to contact L.C. for much of the services period and was only able to maintain contact with L.C. when she was arrested and jailed in Nueces County, Texas during the latter third of the case. At that point, L.C. began her services, and completed them within two months.[3] The case remained open for eighteen months. According to Brother, the Department was "dismissed" in November 2020. Brother stated that but for the Covid standards, L.C.'s parental rights would have been terminated in 2020. Brother explained that L.C. had additional opportunities because of the pandemic, such as extensions, the ability to complete services remotely, and her receipt of unemployment benefits.

The Department removed A.C. from L.C. for a third time in May 2021, about six months after the second case concluded. According to Brother, the Department received a report that L.C. attempted to run over her boyfriend while A.C. was in the vehicle. L.C. fled the scene prior to the police arriving. The next day, the police were dispatched to an estate sale due to concerns about a woman with a child who was acting "very manic," appeared to be under the influence of something, and was hallucinating. The police

---

[3] Brother attributed the fast completion of services to the fact that L.C. was allowed to complete services via Zoom.

arrived. L.C. grabbed A.C., barricaded herself in a room with A.C., and hid drug paraphernalia in a sofa, which the police later found. L.C. asked the police to contact the Department to pick up A.C. On May 25, 2021, the Department was appointed A.C.'s temporary managing conservator on an emergency basis.

Brother testified that the trial court ordered L.C. to complete services including a psychological evaluation, counseling, substance abuse (preferably inpatient), domestic violence classes, and ongoing drug testing. Brother stated that she reviewed the service plan with L.C. several times and that she mailed a copy of the service plan to L.C. a couple of times. According to Brother, she worked with L.C. in the previous case, and "[L.C.] knows what a family plan is and what the tasks are[,] and she's familiar with kind of the way that our cases are run." Brother stated that L.C. had not provided any certificates to show that she has completed the parenting classes as required by the service plan. Brother said that although L.C. claims to have completed some of the services in the family plan, L.C. had not sent Brother "any documentation as to completion or even participation in those programs."

Brother testified that when the case started on May 22, 2021, and L.C. was arrested and released by the police the next day, the Department did not hear from L.C. for the rest of May and into June. L.C. was arrested again on June 9, 2021, for possession of an illegal substance. L.C. was released from police custody on June 13, 2021. L.C. did not contact the Department at this time. L.C. was again arrested on July 3, 2021. Brother stated that L.C. has been detained since that date in a substance abuse treatment facility due to her criminal charges and court-ordered inpatient treatment. Brother testified that

6

L.C. did not initiate services or contact the Department prior to Brother's contact with L.C. in the treatment facility.

Brother said that, although L.C. can recite what she learns due to the services, she has not seen that L.C. is able to apply the lessons. Brother testified that because the Department had been involved with L.C. for the past four years, she believes that L.C. has "demonstrate[d] an inability to self-monitor and be a successful, safe parent." According to Brother, L.C. "is not able to hold herself self-accountable . . . [because w]hen she's not being monitored by either the Department or parole, she relapses." Brother continued, "And she's done this time and time and time again to where she has not demonstrated real change and any behavioral change that would indicate to me that she would be a safe option for [A.C.] long term." Brother testified that L.C. does not "acknowledge . . . her role in the situation and why [A.C.] has come into [the Department's] care three times." Brother said that L.C. blames others for the removals and that "at this point, the . . . history and just the fact that [A.C.] is getting older, I don't believe that [L.C.] has demonstrated that he's been a priority and that he is going to be in a different situation when he goes back."[4] Brother recommended termination of L.C.'s parental rights.

According to Brother, A.C. changed dramatically since she saw him in 2020 when the Department's second case was dismissed. Brother explained:

> He was talking when I left his case in November. He was very bonded with
> me. He would tell me that he loved me. He was able to voice when he was

_____

[4] Brother also stated that she had not received certificates showing that L.C. had completed the ordered services. However, Brother believed that L.C. would complete services given an opportunity. Nonetheless, Brother was concerned that although L.C. has completed services in the past, she cannot demonstrate "those changes" that are necessary to "keep [A.C.] safe."

7

hungry, when he was hurt. When I saw him when he came back into care, he wasn't talking, like, at all. When I walked in the home, it was like walking in and seeing a shell, like he just wasn't there. It took several months to—for me to start seeing [A.C.] again and start seeing the kid that—that I knew.

My concern if we do end up—if this happens again is he's four. If this pattern continues to repeat itself, I'm significantly worried that we're going to cross that line with him to where if he comes back into care with more trauma than he—we might not get the same [A.C.] back. We're not going to get that kid back and he's going to lose the potential of who he could become[,] and I don't think that's fair to him.

I see a lot of kids come in and out and they do cross that point of no return. To where, you know, they don't—they're not going to meet their full potential anymore. That's my concern with [A.C.] He's doing really well right now. I don't think he's crossed that line. He has gone through trauma, but he's responded very well to therapy and to the services he's getting. And I do feel that he, at this point in time, would very much be able to reach his full potential.

On cross-examination by L.C., Brother stated that evidence that L.C. has been sober in the drug facility and is required to submit to drug testing as part of her criminal case is not "enough" because "[i]t wasn't enough in the last case." Brother said, "I hate to keep going back to historic patterns, but she tested clean for . . . almost a year in the last case, and . . . she gave us, I believe, two clean hair follicles at the end of that last case." Brother noted that L.C. has "done this . . . and the more time goes by for [A.C.], the more detrimental this is." According to Brother, the previous removal "was very traumatic" for A.C. Brother testified, "This child has spent 80% of his life in care" and expressed concern for A.C.'s long term safety. Brother said, "At this point with [A.C.] getting older and the trauma that he's already gone through, I don't think that the Department can take that risk and continue with another reunification right now."

L.C. testified that she used methamphetamine for the first time when she was

seventeen. L.C. only recalled two arrests for illegal substances—one in April 2020 and another in May 2021. L.C. acknowledged that there may have "possibly" been more. L.C. also acknowledged that she was arrested for aggravated assault in December 2019; however, she claimed that she acted in self-defense.

L.C. stated that she had not had contact with A.C. since May 2021 when she was arrested, and he was removed. According to L.C., she continued to ingest methamphetamine during the pendency of this case until she was sent to the treatment facility. L.C. testified that she had not used drugs for thirteen months while at the treatment facility. L.C. admitted that she was ordered to inpatient drug treatment due to her criminal case as an alternative to prison, and she was on probation for possession of a controlled substance. According to L.C., she works approximately thirty-five hours per week at a local fast-food restaurant, pays about $134 per week in expenses, and the remaining income is saved on a "pay card." L.C. stated that she hopes to be released to a "sober living [facility] for women and continue" with her sponsor. L.C. denied doing drugs while pregnant and claimed that a drug test had been performed when she was sick with an upper respiratory infection that presented a "false" positive for drugs. L.C. explained that as to the second removal of A.C., she "had left" her mother's home and "went to the Bluff to visit with a friend and [her mother] didn't know where [she] had went." Therefore, according to L.C., her mother called the Department "to see if they knew where I was at and if they could go find me."

L.C. stated that "[t]his time is different because I've spent a lot of information, retain a lot of information, about the disease of addiction and it's helped me a lot." L.C. testified

that she would "love" for A.C. to be placed with her mother while she completes her in patient drug treatment. She said, "I would love for him to be with me, but that's unrealistic right now."

Kathleen Lamb, Ph.D., A.C.'s therapist, testified that she has worked with A.C. for a year,

> working on his social emotional skills, self-help skills. He has a speech therapist to help with his speech. He has an occupational therapist to help with his sensory issues. Basically, when I began with him, he was four years old and he wasn't potty trained. So, he was really delayed socially, emotionally. So, we are working on boundaries.

> Certainly, he's now in daycare doing much better. He's getting more social interaction, learning just appropriate boundaries for a little—he's five now. He can use the restroom, dress himself. He was quite delayed when I began with him when he was four.

Dr. Lamb opined that A.C.'s developmental delays were caused by neglect. According to Dr. Lamb, A.C. had been removed by the Department "because it was an unsafe environment where he had been." Dr. Lamb stated, "[T]here was neglect, basically. He wasn't getting social, emotional stimulation . . . ." Dr. Lamb opined that had A.C. not been neglected, he would have shown the "social emotional" growth "to go along with the cognitive development." According to Dr. Lamb, now that A.C. is in a foster home, he has shown progress. Dr. Lamb stated, "The only mother he knows is his foster mother. . . . His foster mother is his mother. . . . [A]s long as I've been his therapist, he's never had a relationship with his biological mother." Dr. Lamb continued, "During the whole time, he's never had any—any relationship with his mother. No visits or anything like that is what I'm saying when it comes to his biological mother." Dr. Lamb believed that it would be better if A.C. were permanently placed with his foster parents. She

explained that A.C. is "very attached" to his foster placement "and part of his growth and process is the safety and the attachment he currently has."

Dr. Lamb stated that A.C. "feels very safe" at his foster home and that he has "bonded well" with his foster family. She said, "[H]e just continues to grow socially, emotionally. And that has a lot to do with the safe environment with the relationship with the—with the parent. With the guardian, if you want to say."

On cross-examination by L.C., Dr. Lamb stated that although she agreed that L.C. would have better parenting skills after going through drug treatment, "this is the second removal that he had." Dr. Lamb stated that if A.C. were returned to L.C., counseling would be required "because he needs to reestablish a bond with her."

Libby Marin, A.C.'s guardian ad litem assigned by "CASA of the Coastal Bend," testified that she met A.C. when he was three-years old, and he was "definitely behind in speech, physical activity, motor development, behind socially, and still very detached from communicating with people." Marin said, "He didn't have a good grasp of having a conversation or, you know, even understanding how new people were coming to his life." According to Marin, recently after being in foster care, she noticed that "he is developmentally on track in just about every way," A.C.'s "language development has really come a long way," and "[p]hysically, he has become so much more coordinated." Marin testified that A.C. "feels safe and part of the foster family that he is with right now." Marin did not expect A.C. to have progressed as he has when she first met him "[b]ecause children that have been impacted by trauma, it can take a lot for them to developmentally move past that." Marin explained, "And, so, I think it speaks a lot to the consistency [A.C.]

11

has had, as well as the services that he has had on a consistent basis." Marin testified that she has not interacted much with L.C. and has only "spoken at length with his therapist, school, his foster parents, [the Department], his support system." Marin stated, "I very much believe that it is in [A.C.'s] best interest for parental rights to be terminated so that [A.C.] can move forward in a safe and consistent environment that allows him to live his life."

On cross-examination by L.C., Marin testified that based on her review of A.C.'s "history and the track record and the repeated patterns" she did not believe "that returning [him to L.C.] would be a positive thing for his long-term development." Marin said, that although it was not an "easy" decision for her to make because she believes that a parent's rights "is one of the most special and cherished relationships on our planet[,] . . . [,] it is [her] job to speak out for [A.C.]. Marin stated that "in looking at the track record and the history and the patterns," Marin did not believe that returning A.C. was in his best interest.

Jeana Banta, A.C.'s foster mother, testified that A.C. was "delayed" physically, socially, and emotionally when he was first placed in her home. Specifically, Banta noted that A.C. lacked "motor skills, fine motor skills." Banta said that she has seen A.C. make "some really great strides in his fine motor skills," his use of "his words in a much more appropriate way," and "he has grown socially and emotionally." Banta stated, "His social skills with his friends and my nieces and nephews seem appropriate for his age and his emotional skills." Banta believed that A.C. "has grown a lot." Banta stated, "My future plans are to help [A.C.] succeed, just like he's been doing, and to see his growth

12

continued." Banta testified that the foster family is "extremely committed to [A.C.]," and would like to adopt him. On cross-examination by L.C., Banta disagreed that A.C.'s progress occurred in part because he is older. Instead, Banta attributed his progress to the services he has received. Banta stated that A.C. "has made tremendous growth and tremendous strides," in that "[h]e has progressed and met some of his therapy goals." According to Banta, A.C. has better coordination and speech. Banta testified that she believes that A.C. is "happy" in his placement and said, "[A.C.] has actually verbalized that, as well."

### III. STATUTORY GROUNDS

Following a bench trial, the trial court terminated L.C.'s parental rights to A.C. The trial court set out four grounds for termination including that L.C. violated § 161.001 of the Texas Family Code by (1) "knowingly plac[ing] or knowingly allow[ing] [A.C.] to remain in conditions or surroundings which endanger [his] physical or emotional well-being," *see* TEX. FAM. CODE ANN. § 161.001(1)(D); (2) engaging "in conduct or knowingly plac[ing] [A.C.] with persons who engaged in conduct which endangers the physical or emotional well-being of [A.C.]", *see id.* § 161.001(1)(E); (3) "constructively abandoning [A.C.] who has been in the permanent or temporary managing conservatorship of the Department for not less than six months," *see id.* § 161.001(1)(N); and (4) failing to "comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the [child who has] been in the permanent or temporary managing conservatorship of the [Department] for not less than nine months as a result of the [child's] removal from the parents under Chapter 262 for the abuse or neglect of

13

the children," *see id.* § 161.001(1)(O). The trial court further found that termination of L.C.'s parental rights was in A.C.'s best interest. This appeal followed.

By her first issue, L.C. contends that the evidence is legally and factually insufficient to support the trial court's findings that she violated subsections (D) and (E) of the statutory grounds for termination.[5]

## A.    Applicable Law

Subsection 161.001(b)(1)(D) allows termination when the evidence proves by clear and convincing evidence that the parent knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the child's physical or emotional well-being, and subsection 161.001(b)(1)(E) allows termination if the parent has engaged in conduct or knowingly placed the child with persons who engage in conduct which endangers the child's physical or emotional well-being. TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). "Endanger" is defined as exposing to loss or injury or to jeopardize. *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). The child need not actually suffer injury, however, endanger "means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Id.*

Subsection (D) focuses on the child's living environment and refers to the suitability of the child's living conditions and of the parent's conduct in the home. *In re J.W.*, 645 S.W.3d 726, 749 (Tex. 2022) (quoting TEX. FAM. CODE Ann. § 161.001(b)(1)(D)).

---

[5] Only one statutory ground finding is necessary to support a judgment of termination, but in *In re N.G.*, "the Texas Supreme Court held that due process demands that we review the evidence supporting findings under Grounds D and E when they are challenged on appeal because termination of parental rights under these Grounds 'may have implications for . . . parental rights to other children.'" *In re L.W.*, 609 S.W.3d 189, 195–96 (Tex. App.—Texarkana 2020, no pet.) (quoting *In re N.G.*, 577 S.W.3d 230, 234 (Tex. 2019) (per curiam)). Therefore, we will address both grounds in our analysis.

14

Subsection (E) focuses on the parent's involvement in a conscious course of conduct including not only acts but also omissions or failures to act that endanger the child. *In re E.G.*, 643 S.W.3d 236, 252 (Tex. App.—Amarillo 2022, no pet.). The specific danger to the child's well-being may be inferred from the parent's conduct and need not be established as an "independent proposition." *Id.* Because the evidence pertaining to subsections 161.001(b)(1)(D) and (E) is interrelated, we may conduct a consolidated review. *Id.* (citing *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.)).

**B.      Analysis**

Here, the evidence showed that L.C. admitted to the Department that she used drugs while she was pregnant with A.C. *See In re J.W.*, 645 S.W.3d at 749 ("Certainly, Mother's use of controlled substances while pregnant created a dangerous environment for J.W."). Although, L.C. denied that she used drugs at trial, the trial court could have disbelieved her testimony and believed Brother's testimony that L.C. told the Department personnel that she used drugs while pregnant. *See In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009) ("recognizing that the factfinder, not the appellate court, is the sole arbiter of the witnesses' credibility and demeanor").

In addition, evidence was presented that L.C. continued to use drugs throughout the first, second, and third cases with the Department where A.C. was removed from her care, only stopping her drug use after being arrested and while in an inpatient facility that was ordered in lieu of jail. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied) (concluding that the parent using illegal drugs and violating parole

15

provided sufficient evidence of endangerment). L.C. has a history of being incarcerated, and after she was arrested for the possession of a controlled substance and tampering with evidence offenses, she called the Department to take A.C. Imprisonment "alone is not a basis to terminate a parent's rights." *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.). Nonetheless, imprisonment "is an appropriate factor to consider because when a parent is incarcerated, he or she is absent from the child's daily life and unable to provide support to the child, negatively impacting the child's living environment and emotional well-being." *Id.* After voluntarily surrendering A.C. to the Department, L.C. did not contact the Department to determine the steps necessary to secure his return. *See In re J.M.T.*, 519 S.W.3d 258, 267 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) ("A factfinder may infer from a parent's failure to take the initiative to complete the services required to regain possession of his child that he does not have the ability to motivate himself to seek out available resources needed now or in the future.") In addition, while A.C. was in the Department's care, she continued using drugs and was arrested again even after she gave him to the Department. *See In re B.C.S.*, 479 S.W.3d 918, 926 (Tex. App.—El Paso 2015, no pet.) (concluding evidence of criminal conduct, convictions, and imprisonment and their effect on the parent's life and ability to parent may establish an endangering course of conduct); *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("If the imprisonment of the parent displays a voluntary, deliberate and conscious course of conduct, it qualifies as conduct that endangers the child.").

L.C. has a long history with the Department as she has had another child

16

permanently removed from her care and her parental rights were terminated to that child. L.C. has not had custody of A.C. for most of his life. In that time, the evidence showed that A.C. has bonded with Banta and considers her his mother. The trial court could have reasonably inferred that A.C. has not been able to form a bond with L.C. based on evidence that A.C. has a strong bond with Banta, A.C. considers Banta his mother, L.C. failed to have contact with A.C. for over a year, and L.C. has not had custody of him for most of his life. *See In re M.L.R.-U.*,517 S.W.3d 228, 239 (Tex. App.—Texarkana 2017, no pet.) (noting that mother's lackluster visitation with her children and passive interaction with them demonstrated a disinterest in regaining custody and weighted in favor of termination of mother's parental rights).

The evidence showed that in the short period that A.C. was in L.C.'s custody, A.C. has been homeless, suffered from injuries caused by his homelessness, been in a vehicle when L.C. engaged in domestic violence by trying to run over her boyfriend, been present while L.C. was under the influence of drugs causing her to act erratically and to hallucinate, and been locked in a room with L.C. and her drug paraphernalia as she evaded the police. *See Walker*, 312 S.W.3d at 617 ("Abusive and violent criminal conduct by a parent can produce an environment that endangers the well-being of a child."). In addition, L.C. had suicidal ideation. *See In re E.G.*, 643 S.W.3d at 252 ("Suicidal ideation may also contribute to a finding that a parent engaged in endangering conduct."). L.C.'s conduct and living conditions have subjected A.C. to a life of uncertainty and instability.[6]

---

[6] The evidence showed that L.C. had been arrested for assault causing bodily injury, evading arrest, engaging in organized criminal activity, assault causing bodily injury to a family member, criminal trespass on five occasions, hindering apprehension or prosecution of a known felon, unlawful possession of a firearm by a felon, tampering or fabricating physical evidence with intent to impair, possession of

17

*See Walker*, 312 S.W.3d at 616–17 ("Conduct that routinely subjects a child to the probability that the child will be left alone because a parent is jailed endangers both the physical and emotional well-being of the child.").

Finally, there was evidence that A.C. suffered from neglect while in L.C.'s care that caused him to become "behind in speech, physical activity, motor development, behind socially, and still very detached from communicating with people." Brother observed that when A.C. was removed a third time from L.C., although he had previously been able to talk, "was very bonded with [her]," told her that he loved her, and was "able to voice when he was hungry and when he was hurt," A.C. had regressed as he "wasn't talking, like, at all. When I walked in the home, it was like walking in and seeing a shell, like he just wasn't there. It took several months to—for [Brother] to start seeing [A.C.] again and start seeing the kid that—that [she] knew." This evidence shows that A.C. had suffered actual rather than metaphysical harm to his physical, emotional, and social development, which was caused by L.C.'s neglect. *See Boyd*, 727 S.W.2d at 533. Brother opined that if A.C. were returned, his progress may be permanently stifled.

Based on the foregoing and giving due deference to the trial court's findings, we conclude that the trial court could have formed a firm belief or conviction that L.C. knowingly allowed A.C. to remain in an endangering environment and that she engaged in endangering conduct by, among other things, neglecting A.C., failing to stop using drugs while caring for A.C. despite two previous removals, committing an aggravated

marihuana, four possession of a controlled substance offenses, resisting arrest, and aggravated assault with a deadly weapon.

18

assault with a deadly weapon in A.C.'s presence, and committing a laundry list of offenses that posed a danger to A.C.'s well-being. *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E). The evidence was legally and factually sufficient to support termination. We overrule L.C.'s first issue.

## IV.    BEST INTEREST

The same evidence of acts or omissions used to establish grounds for termination under § 161.001(1) may be probative in determining the best interests of the child. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). In *Holley v. Adams*, the Texas Supreme Court provided a nonexclusive list of factors for the trier of fact in a termination case to use in determining the best interest of the child, including the following: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. 544 S.W.2d 367, 371–72 (Tex. 1976).

It is a compelling state interest to establish a stable and permanent home for A.C., and Banta has shown that her family is able to do this for A.C., while L.C. has not shown a similar ability. *See In re C.E.K.*, 214 S.W.3d 492, 498 (Tex. App.—Dallas 2006, no pet.). A.C. is "happy" in his placement and has not had a relationship with L.C. for over a year.

19

A.C. believes that Banta is his mother, and L.C. has not had contact with A.C. in a year. *See In re S.R.*, 452 S.W.3d 351, 369 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("When children are too young to express their desires, the factfinder may consider whether the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent."). The evidence showed that Banta made sure that A.C. received the therapies he needed to progress developmentally and that L.C. neglected to provide the same. *In re M.D.M.*, 579 S.W.3d 744, 770 (Tex. App.—Houston [1st Dist.] 2019, no pet.) ("Evidence that a child is well-cared for by a foster family or a proposed adoptive placement, is bonded to the proposed placement, and has spent minimal time in the presence of the child's parent is relevant to the best interest determination and, specifically, is relevant to the child's desires."). Through her many acts and omissions of not providing a stable home environment and limited time spent with A.C., L.C. has shown that she is unable or unwilling to apply the lessons she has learned during any of A.C.'s prior removals, while Banta has provided a stable home environment for A.C. and wishes to adopt him.

The evidence presented shows that A.C. is thriving in his current environment and that he has made a lot of progress developmentally. Banta has provided a stable home for A.C. and has provided the necessary resources to help him progress appropriately. L.C. has not been able to show that she is able or willing to provide a stable living environment for A.C., and instead has kept him in an unstable and dangerous environment for the small percentage of time that she has had custody of him. Moreover, L.C. does not have a plan to house A.C. herself and stated that she would like A.C. to be

20

placed with her mother because it is unrealistic at the current time for A.C. to be placed with her.[7] L.C.'s inability to provide a stable home, continued drug abuse, continued criminal conduct, inability to apply the lessons she has learned from completing her service plans in the prior two removals, and refusal to comply with the most recent court-ordered service plan, supports the trial court's finding that L.C. has not been and would not be able to provide for A.C.'s emotional or physical needs permanently. *See Walker*, 312 S.W.3d at 619. "The fact finder may compare the contrasting plans for a child by the parent and the Department and consider whether the plans and expectations of each party are realistic or weak and ill-defined." *In re J.D.*, 436 S.W.3d 105, 119–20 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Moreover, "[t]he stability of the proposed home environment is an important consideration in determining whether termination of parental rights is in the child's best interest." *Id.* at 120. Thus, the trial court here could have compared L.C.'s plans with the Department's plans and determined that L.C.'s plans were weak and unrealistic because there was no evidence that her mother would take custody of A.C. and the evidence showed that A.C. could not be placed with L.C.'s mother because a person who lived in the household has a history with the Department and a criminal history of. *See id.* ("The trial court may have discounted the Mother's testimony about her plans for the Child and determined they were unrealistic in light of the testimony that the Mother was unable to maintain employment or independent housing.").

The evidence regarding endangerment, discussed in support of the trial court's

---

[7] Evidence showed that the Department had determined that L.C.'s mother's home was not an appropriate placement for A.C. because L.C.'s mother lived with a person who had a history with the Department and a criminal history. Moreover, no evidence was presented that L.C.'s mother was willing to take custody of A.C. Thus, the trial court was free to find that such placement was not feasible.

finding under subsections 161.001(1)(D) and (E) above, is also probative of a finding of that termination is in A.C.'s best interest. *See Walker*, 312 S.W.3d at 619. When A.C. was removed the second time, he was able to talk, told Brother he loved her, and was able to articulate his needs; however, after A.C. was returned to L.C. for approximately six months, when the Department removed him for a third time, he had become a "shell" of his former self and was unable to talk and unable to state his needs. A.C. needed speech therapy among many other services, which Dr. Lamb attributed to neglect. The danger of returning A.C. to L.C. has been shown because after the second removal, L.C. continued to abuse drugs while in his presence, was arrested for possession of a controlled substance, locked herself in a stranger's room at an estate sale with A.C. in order to evade the police while in possession of a drug pipe, attempted to run over her boyfriend with a vehicle with A.C. in the vehicle, neglected A.C.'s developmental needs, and acted erratically in his presence. All acts and omissions which endanger his well-being as explained above are probative of a finding that A.C. has been and would be in the future in emotional and physical danger if he were returned to L.C., and all support the trial court's best interest finding. *See id.*

As previously mentioned, L.C. did not initiate contact with the Department after the third removal. Instead, L.C. waited for the Department to investigate her whereabouts and contact her. In addition, L.C. has not had contact with A.C. during the pendency of the case. *See In re M.L.R.-U.*,517 S.W.3d at 239; *In re M.D.M.*, 579 S.W.3d at 765 ("A factfinder may also infer that a parent's lack of contact with the child and absence from the child's life endangered the child's emotional well-being."). Moreover, L.C. has shown

22

poor parenting abilities by committing the offense of aggravated assault with a deadly weapon when she attempted to run over her boyfriend with A.C. in the car, and by neglecting A.C.'s developmental needs. *See id.* (noting that the parent lacked parental abilities due to family violence and showing no interest in caring for the children, which supported a finding that termination was in the children's best interest).

In light of all of the evidence, the trial court could have reasonably formed a firm belief or conviction that termination of L.C.'s parental rights was in A.C.'s best interest. Accordingly, we hold that the evidence is both legally and factually sufficient to support the trial court's finding that termination in the best interest of A.C. We overrule L.C.'s second issue.

### V.    CONCLUSION

We affirm the trial court's judgment.

JAIME TIJERINA
Justice

Delivered and filed on the
9th day of February, 2023.